# J. J. Burke and E. E. Brown vs. The Territory of Oklahoma.

1. Contempt—*Power of Court—Enactment Not a Limitation*—The legislature did not purpose, by the provisions of the criminal statutes which makes certain contempts of court a misdemeanor punishable by indictment, to take away from the court the power to punish such contempts, in the usual manner.

2. Contempt — *Power to Punish Inherent* — The power to punish for contempt is inherent in all courts of record.

3. Contempt—*Power to Punish*—The legislature has not power, in the absence of constitutional provisions, to limit or regulate the inherent power of the courts to punish for contempt.

4. Contempt—*Jury Trial— No Right of* — The party accused has no right of a trial by jury in a contempt proceeding.

5. Contempt Proceedings—*Judicial Notice*—Courts take judicial notice of their own proceedings, and in a contempt proceeding, where the contempt consists of an improper publication concerning matters pending in court, the publication being admitted, the court may determine all the necessary facts without other evidence of what occured in court than the court's judicial knowledge, and without the necessity of a formal trial, including the introduction of evidence.

6. Contempt—*Appeal, Questions Considered on*—On appeal from a judgment in a contempt proceeding only questions of law will be considered and questions of fact will not be reviewed.

7. Contempt—*Act of March 2, 1831, Limitation of*—The act of March 2, 1831, and which is embodied in § 725 of the revised statutes of the United States, limiting the power of the courts of the United States to inflict summary punishment for contempt of court, is not applicable to the courts of this territory, these courts not being one of the courts of the United States to which this provision of the acts of congress is applicable.

8. Contempt of Court—*What Constitutes*—Publications made in a daily newspaper, while a matter is pending in court, as to whether or not a certain report, presented by the grand jury, shall be received by the court or returned to the grand jury for further proper action and correction, to the effect that the actions of the judge seemed to indicate that he intends to withhold the report, and that if the judge persists in carrying out such intention, by suppressing the report of

the grand jury, the act might be characterized as a flagrant violation of the people's rights, and charging by direct implication that the action of the court "is an effort to brow-beat the grand jury, an effort to bend the grand jury to the will of the judge" and "a serious matter," constitute a contempt of court.

*Error from the District Court of Oklahoma County.*

### STATEMENT OF THE CASE.

On the 23d day of February, 1894, an information sworn to by W. H. Ebey, clerk of the district court of Oklahoma county, Oklahoma Territory, was filed in the district court of said county, charging defendants, J. J. Burke and E. E. Brown with contempt of court, in the publication of two certain articles in the "Times-Journal," a daily newspaper published at Oklahoma City, and in writing a certain letter to the judge of the district court, the writing of the letter being a part of the commission of contempt. The allegations of the information are all substantially contained in the findings of fact hereinafter given. The defendants, after demurring to the information and after the demurrer was overruled, filed their answer denying that the publication of the articles set out in the information related to matters pending in court, denying that the statements in the articles were inaccurate or untrue, and denying the legal effect of these publications, and the letter written the judge of the court. The defendants in their answer admitted the publication of the articles and the writing of the letter referred to, to the judge of the court, and alleged "that since the publication referred to in the information, said Henry W. Scott, judge of the district court, had announced, in open court to the grand jury, that the matters and things, in the paper or report contained, were not matters or things within the jurisdiction of the grand jury, or of said court."

The answer contained a specific paragraph as follows:

"4. For a further defense to the matters and things in the said information alleged, these defendants allege the truth to be that, as publishers and proprietors of the newspaper referred to in the information, they published the facts, that the grand jury had returned to the Hon. Henry W. Scott, as the judge of said court, a paper which was neither an indictment nor accusation in writing against public officers, but what was supposed to be a report of some kind or nature, as a matter of public news to patrons, as well also as the fact that the judge had not made public the contents of the paper up to the hour of going to press, of that edition of the defendants' paper, as well also of the fact that the defendants, as enterprising and energetic caterers to a news-loving and enlightened public had addressed a respectful letter to the Honorable Henry W. Scott, requesting to be permitted to give to its patrons the contents of said paper, so handed in by the grand jury, as aforesaid, as well, also, as the fact that up to the hour of going to press of the said edition no answer had been received from the honorable judge. The defendants further say that they published the criticisms and animadversions upon the judge's actions and refusals hereinbefore specified, believing that they were the proper subject of criticism and newspaper comment, and without any intention or desire to, in the leastwise inferfere with, hinder, delay, impede, warp or control the administration of justice in said court, or to in anywise affect the action of the grand jury or said judge in the administration of justice, and not seeing how said criticisms could have any such effect, and not intending to reflect upon the integrity of said judge, the Honorable Henry W. Scott, in the administration of any of the affairs of his said office, or the conduct of said court."

The record shows that after defendants filed their answer and after hearing the defendants fully and the arguments of counsel and being fully advised in the premises, the court made the following findings of fact:

"1. That the district court of the Third judicial dis-

trict of Oklahoma Territory, sitting in and for the county of Oklahoma, in the Territory of Oklahoma, was in session on the 21st day of February, 1894, and had been so in session for a long time before then, under the law, and is to so remain in session for a long time thereafter.

"2. That the grand jury for said county was also in session on said 21st day of February, 1894, long before, and thereafter.

"3. That said grand jury, on said 21st day of February, 1894, returned into court the matters remaining in their hands as a territorial grand jury, and reported that they had no further business in their hands.

"4. That among the matters returned by said grand jury, at that time, was a return, report and proceedings of their examination of the jail and poor house, with the recommendations concerning the jail, and their proceedings in the premises.

(Accompanying said report, return and proceedings, and as a part thereof, was matter entirely foreign to the subject of said report and return, which foreign matter cast mere reflections upon certain individuals and persons.)

"5. That at the time of the reception, by the court, of said report and return, a hasty reading of the matter led the court to doubt the propriety of placing it on the records thereof; and the court, at said time, was engaged in the trial of a jury case, and it was not thought proper to delay the trial to take the time to consider the report and the return, or that part of it deemed to be objectionable, and the court directed the grand jury, that, as they had to report on the 23d day of February, next thereafter, as a grand jury for the United States, they would not be discharged as a territorial grand jury until that time.

"6. That such action as to said grand jury was taken to enable the court to refer to said report, and return back to the jury in the meantime, if the court concluded it should be so referred back.

"7. That on the morning of the said 23d day of February, 1894, the court referred said report and return back to the grand jury, with instructions to separate

the foreign matter from the matter on the jail and poor house, and make further return to the court. And further instructed the grand jury that if they were in possession of sufficient evidence of crime, on the part of any persons or individuals whomsoever, to return to the court an indictment or accusation in form of law, so that the court could have the matter judicially investigated and the guilty party punished.

"8. That the 22d day of said February, 1894, was a legal holiday, and the court was not in session on that day.

"9. That on the morning of said 22d day of February, 1894, the said article, set out in the complaint herein, was published by the defendants in their newspaper, "The Oklahoma Times-Journal," printed, published and circulated in Oklahoma City, Oklahoma county, and Territory of Oklahoma, and reads as follows, to-wit:

"EXTRAORDINARILY INJUDICIAL.

"Yesterday forenoon the grand jury filed into the court and the foreman handed the judge a package of papers. The judge looked them over carefully, and one paper he seemed to scan a second time. Then he turned to the foreman and asked, 'Who prepared this report?' Mr. Trosper, foreman of the grand jury, answered, 'A committee composed of Mr. Welch, Mr. McCartney and myself.'

"The extraordinary question caused every attorney in the court room to start with surprise, and further developments were awaited with interest. The grand jury announced, through their foreman, that they had completed their labors as a territorial grand jury, but notwithstanding that fact, Judge Scott held them until Friday, for what purpose nobody seems to be able to surmise.

"A representative of the Times-Journal met Mr. Ebey, district clerk, down on the street an hour after the court scene, and asked permission to go into his office and copy the grand jury report. Mr. Ebey seemed very willing to render the favor asked. As soon as he could do so, the Times-Journal representa-

tive went to the district clerk's office to copy the report. He was informed by Mr. Ebey that the report was not on file, and stated further, 'the judge informed me that he did not think he would allow the report to be made a part of the record of the clerk's office.' The Times-Journal man left the clerk's office almost dumfounded. Thinking, however, that there must be some mistake, and that the judge was holding it merely for examination, the following note was addressed to him:

" 'JUDGE HENRY W. SCOTT, *Dear Sir:* It has been our custom to publish in full all grand jury reports upon the condition of the county, and acts of the county officials. We therefore ask you to permit us to make a copy of the report, filed this forenoon, in time for publication in tomorrow morning's issue of the Times-Journal. If you will leave the report with the district clerk in time to be copied before the hour of closing his office you will greatly oblige ũs.

" 'Respectfully, BURKE & BROWN, Per B.'

"A Times-Journal representative was at the clerk's office at 5 o'clock, and again at 5:45, but no report had been filed. At that time the judge was on the bench, we presumed, so no effort was made to see him. Other pressing business prevented further effort to secure the report. Although every act seems to indicate that Judge Scott intends to withhold that report, we cannot believe that he really meant all that his report to the district clerk conveyed.

"If Judge Scott presists in carrying out the intentions expressed to District Clerk Ebey, of suppressing the report of the grand jury, the act may rightly be characterized as the most flagrant violation of the rights of the people ever undertaken in Oklahoma.

"The report made by every grand jury, is a statement to the people of the county of the condition of the county affairs, and the acts of county officials. It is no business of the judge's, whether it is a laudatory report, or one of severe denunciation of unbusiness like methods, so long as it is the honest expression of the grand jury. The judge has no right to say of what character that report may partake, and if the report suggests corruption, or loose business meth-

ods, it is the judge's moral duty to commend the grand jury for its moral courage in daring to inquire into the affairs of the county, without fear or favor.

"A suppression of that report is an effort to browbeat the grand jury. It is an effort to bend the grand jury to the will of the judge. Such an attempt is a serious one. Judge Scott does not recognize how serious.

"10. That said article related to the report, return and proceedings of said grand jury, which, as above stated, was held by the court under advisement, and was so published while it was so held by the court.

"11. That said article was published with the intent to coerce the court to place the objectionable, matter in said report, return and proceedings upon the records thereof, and as a matter of law, the court finds that the publication of the articles complained of are calculated, and were intended, by the said J. J. Burke and E. E. Brown to impede and obstruct and embarrass the administration of justice in said court, and to impeach the integrity of said court, and the judge thereof.

"12. That on said 21st day of February, 1894, and while the said court was so in session, and while certain matters, things and proceedings. were pending before the said grand jury, and the said court, and were being held under the advisement and consideration of the said court, as aforesaid, the said defendants, J. J. Burke and E. E. Brown, and each of them, executed and caused to be delivered, by mail, and by the use of a special delivery stamp, to the judge of the said court a certain letter, which said letter is in words and figures as follows, to-wit:

"'Oklahoma City, Feb. 21, 1894.

"'Judge Henry W. Scott, Oklahoma City, O. T.
"'Dear Sir: It has been our custom to publish, in full, all grand jury reports upon the condition of the county, and the acts of the county officials. We therefore ask you to permit us to make a copy of the report filed this forenoon in time for publication in tomorrow morning's issue of the Times-Journal.

"'If you will leave the report with the district clerk

in time to be copied before the hour of closing his office, you will very greatly oblige us. .

"'Respectfully,    BURKE & BROWN, Per. B.'

"The court further finds that the said report, return and proceedings of said grand jury was made in said court, between the hours of 11 and 12 o'clock A. M., of said 21st day of February, and that the said letter was delivered to said court, by special delivery messenger, in open court, while the judge was on the bench, and in the midst of a jury trial, between the hours of 2 and 3 o'clock P. M., of said 21st day of February, 1894, and that the court thereupon abated the trial for a moment, for the purpose of signing a receipt book of said special delivery messenger. That said letter related to matters, things, reports, returns and proceedings then and there pending before said court and jury, and was then and there executed and delivered for the purpose, and with the intent of affecting and coercing the action and decision of the said court, while the said court had the said matter under advisement, and of obstructing and impeding the proceedings thereof, and for the purpose, and with the intent, of then and there impeaching the integrity of the judge of said court.

"13. That the defendants, J. J. Burks and E. E. Brown, are guilty of contempt of this court.

"I do, therefore, consider order and adjudge that you, the said J. J. Burke, and you, the said E. E. Brown, and each of you, are guilty of contempt of this court, and it is therefore the judgment, sentence and order of this court that you, the said J. J. Burke, and you, the said E. E. Brown, and each of you, be imprisoned in the county jail of Oklahoma county, and Territory of Oklahoma, for the period of ten days, beginning at noon this day, the 25th day of April, 1894, and that you, the said J. J. Burke, and you, the said E. E. Brown, and each of you, pay a fine of two hundred and fifty dollars ($250), into this court, and into the hands of the clerk thereof, to be applied and directed as required by law, in such case made and provided, and that in default of the immediate payment of said fine adjudged against you and each of you, that you, the said J. J. Burke, and you, the said E. E.

Brown, be, and it is hereby ordered and adjudged that you, and each of you, be further imprisoned in the jail aforesaid until you, the said J. J, Burke, and you, the said E. E. Brown, and each of you, pay the said fine; and that a commitment and warrant of authority issue forthwith, and be placed in the hands of the sheriff of Oklahoma county, to carry this judgment into immediate effect and execution.

"In witness whereof, I have hereunto set my hand this 25th day of April, 1894.

"(Signed)        HENRY W. SCOTT,

"Judge of the Third Judicial District of the Territory of Oklahoma, within and for Oklahoma County."

The court, after making these findings, and before judgment, gave the defendants an opportunity to purge themselves of contempt, in the following language:

"To show the desire of this court to exercise its magnanimity, even at this late hour, in the face of the flagrancy of the manifold contempt of these defendants, as well as to render indisputable evidence of their continued perversity, if this proffer of magnanimity is refused, I will now ask them if they have any offer of retraction or apology to make before proceeding further."

To which the defendant Brown answered:

"All of these matters alleged to be contempt of court were published in the absence of Mr. Burke. He was out of the city and knew nothing about them, and was not in the city until two days after. I have no apology to make."

The defendant Burke replied:

"May it please your honor, I have no apology to make. I am one of the publishers of the Times-Journal, of course, and I shall take medicine along with the other parties."

Thereupon the court sentenced the defendants to pay a fine of $250 each, and be committed to the county jail for a period of ten days. From this judgment the defendants appeal.

*Reddick, Lewis & Snyder* and *Horace Speed*, for plaintiffs in error.

*J. H. Woods, County Attorney,* and *Huger Wilkinson,* for defendant in error.

The opinion of the court was delivered by

BIERER, J.: The plaintiffs in error rely upon four propositions for the reversal of the judgment of the court below, which we will consider in their order.

"1. The offense charged should have been presented by indictment."

Section 2039 of the Statutes of Oklahoma of 1893, provides:

"Every person guilty of any contempt òf court of either of the following kinds is guilty of a misdemeanor; * * * *"

The part of this section, not embodied in the quotation, makes such conduct as that complained of here a misdemeanor; and it is contended by the plaintiffs in error, that, as the acts of the parties charged constituted a misdemeanor, and, as it is such a misdemeanor as may be prosecuted by indictment, that the district court had no power whatever to proceed with the prosecution under an information.

This contention is untenable for two reasons. In the first place, the language of the statute itself shows a clear intention on the part of the legislature not to make contempts of court exclusively punishable by prosecutions by indictment. The act evinces no intention on the part of the legislature to take away from the court a power which it already had to punish contempts of court in the summary manner of such proceedings. The legislature simply provided that contempts of court were also misdemeanors. It declared that an offense against the court, of a certain prescribed kind, was also an offense against the public. This was proper legislation, and in no way affected

the court's power to punish, by the ordinary proceedings, such contempts. The legislature undoubtedly intended that the judge of the court whose office was transgressed, whose dignity was offended, and whose integrity was impeached, should not be the only person to determine whether such acts should be prose cuted. Such conduct is often overlooked by the courts when the acts are a serious injury to the public. The diffidence of courts to take up for investigation and punishment matters which are aimed, not only at the court in its public capacity, but also in its individuality, often permits such transgressions, as contempt of court, to be overlooked and allowed to go unnoticed, by the judges of the courts; and the public welfare, the morals, the good behavior and the proper consideration of a community for governmental functions are thereby often greatly injured. The legislature intended that the public itself might also have a right to prosecute these offenses;· not to take away a power which the court already had to punish the offender, but to prescribe a means in addition to that already possessed for such punishment.

We not only do not think the legislature, by this enactment, intended to take away the power of the courts of this territory to punish by summary proceeding for contempt of court, but this statute could in no way have that effect. The power to punish for contempt of court is inherent in all courts of record. (*Ex parte Robinson*, 19 Wall. 505; *in re. Millington*, 24 Kan. 214; *People vs. Stapleton*, 33 Pac. (Col.) 167; *Middlebrook vs. State*, 43 Conn. 257; *Tyler vs. Hammersley*, 44 Conn. 393; *Holman vs. State*, 105 Ind. 513; *ex parte Terry*, 128 U. S. 289.)

The Organic Act, § 9, vests in the courts of this territory chancery as well as common law jurisdiction, and this carries with it the power to punish for contempt. This is a constitutional provision for this

territory, and the grant of legislative power in the Organic Act vests in the legislature no right to take away any of the inherent powers of the court. The legislature has no power, in the absence of a constitutional provision, to regulate or limit the inherent powers of a court to punish for contempt. (*Middlebrook vs. State; Tyler vs. Hammersley, supra;* Rapalje on Contempt, § 11.)

The defendants' second allegation of error, in the court below, is in not granting a trial by jury.

This contention of the defendants, in the court below, plaintiffs in error here, is also untenable. A party accused in a contempt proceeding has not the right of a trial by jury, and a denial of the right of trial by jury, on such a hearing, does not infringe the constitutional provision guaranteeing the citizen the right of trial by jury. (*Gandy vs. State,* 13 Neb. 445 (14 N. W. 143); *ex parte Grace,* 12 Iowa, 208; Rapalje on Contempt, § 112.)

The third allegation of error is: "The plaintiff was entitled to have the evidence against him produced, and an opportunity to refute it."

The information charged the defendants with a contempt of court, and they were required to answer this information. The information charged the commission of a contempt of court, in that the defendants did certain acts by publishing the articles complained of in their newspaper while the matter referred to was pending in court and undetermined. These acts were not denied. The defendants admitted the doing of them, but sought to excuse themselves from the consequence of the acts by a denial consisting of legal conclusions, and by the allegation of matters which could in no way be a defense. All of the matters of fact which the court found, were matters that were either admitted by the defendants' answer or of which the

court could take judicial knowledge. The false charges made by the defendants were with reference to certain matters which were proceedings of the court. The court knew the truthfulness or the falsity of all of the things referred to as well as, if not better than, any witness could. It certainly knew its own court proceedings as well as any other person. No other person could know them any better than the court itself. The courts take judicial knowledge of their own proceedings and of whatever is done in court, within the limits of their jurisdiction. (Greenleaf on Evidence, vol. 1, § 6.)

On this subject the supreme court of Wisconsin, in the case of *Brucker vs. State*, 19 Wis., 539, says:

"The determination, therefore, depends chiefly upon whether we can take judicial notice of our former order. If we cannot, it seems, upon the record before us, that the objection is well taken; but if we can, then our conclusion would be different. We are inclned to the opinion that, for the purpose of this objection, we can take such notice, and that the former record and order may be considered. The objection is, that the cause had not been remitted. Whether it had or not, the record and proceedings upon the former writ, always before this court, are certainly the best evidence, and we think they may be examined for the purpose of ascertaining the fact."

If the court may take judicial knowledge of its own record proceeding, might not the court in this case take judicial knowledge of whether the court was in session on a particular day, what it was doing at the time, as to · whether or not the grand jury made a report, as to what that report contained, as to whether the report was one which the court should receive or not, as to whether the defendants wrote a letter to the court, which they admit writing and sending, and which the court received, and .the time the court received it, and as to what the court did when this report was presented and as to what

action the court took upon it, and as to when the action was taken? Evidence would not have assisted the court in making a finding on these questions, and there was no necessity for taking any evidence.

In the case of *Hunter vs. N. Y. O. & W. Ry. Co.*, 116 N. Y. 615, the court said:

"Courts are not bound to take judicial notice of matters of fact. Whether they will do so or not depends on the nature of the subject, the issue involved and the apparent justice of the case."

The issue involved in this case being one only as to the court's own proceedings, the fact that the defendants by newspaper articles had attacked the propriety thereof being admitted, and the only remaining element to the completion of the offense being one of motive on the part of the defendants in the publication and that being one which must be gathered from the acts committed, and the manner of committing the acts, was one which the court could and had the right to judicially determine from the facts within its judicial knowledge.

In the case of *Middlebrook vs. State*, 43 Conn. 257, it was held that a formal and judicial hearing were not necessary in a contempt proceeding. On this question the court said:

"If it was necessary that the judgment should be preceded by a trial, and the facts found upon a judicial hearing, as with ordinary criminal cases, it would be otherwise. But in this proceeding nothing of the kind was required. The judicial eye witnessed the act, the judicial mind comprehended all the circumstances of aggravation, provocation, or mitigation; and the fact being thus judicially established, it only remained for the judicial arm to inflict proper punishment."

The only material matters of fact disputed by defendants' answer, if in fact any necessary ones were disputed at all, were matters which the court might

determine without evidence outside of the court's proceedings, being offered, and whether the court correctly determined them or not is not for our consideration. In a case of this kind questions of law only will be examined on appeal.

In the case, *in re Pryor*, 18 Kan. 72, the party was prosecuted for sending a contemptuous and insulting letter to the judge of the court, concerning a matter then pending. That was a case much akin in principle to the one at bar, in that neither in that nor in this case were the parties charged with contempt in open court—in the real presence of the court—but their written language and charges were concerning matters then pending in court. The able jurist, Justice Brewer, after reviewing the matter of the conduct of an attorney towards the court and of the court's consideration of expressions which may, in the moment of disappointment, slip from the lips of a disappointed attorney, and which the court will not always regard as a contempt, said :

"We make these suggestions, not as intimating that such has been the prior conduct of the attorney in this case, for we neither know nor have heard anything outside of this single matter which reflects at all upon him. We do it simply to indicate that the wisdom or necessity of the court's action is not always disclosed by the single matter apparent in the record, and that therefore, in a matter like this, involving personal conduct towards the court, a large regard must be paid to its discretion. If the language or conduct of the attorney is insulting or disrespectful, and in the presence, real or constructive, of the court, and during the pendency of certain proceedings, we cannot hold that the court exceeded its power by punishing for contempt."

In the case of *Tyler vs. Hammersley*, 44 Conn. 393, the supreme court of that state, in defining the extent to which an appellate court would review the proceedings in a contempt case, said:

33

"In the second place, the proceedings upon which the judgment was rendered should not be reviewed except so far as may be necessary to determine whether the court in rendering the judgment acted within the sphere of its jurisdiction. Every court must of necessity possess the power to enforce obedience to its lawful orders and judgments, and punish contempts of all kinds against its authority. It is only when it acts without its jurisdiction that its proceedings in such cases will be interfered with or questioned by a superior tribunal. The principle upon which courts proceed in such cases is clearly stated in the celebrated case of *Burdett vs. Abbot*, 14 East. 1, 150, and the case of *The People vs. Sturtevant*, 5 Seld. 263. In the former case, Lord Ellenborough, in the course of an able and interesting opinion, observed that if a commitment appeared to be for a contempt of the house of commons generally, he would neither in the case of that court or any other superior court inquire further; but if it did not profess to commit for a contempt, but for some matter which could by no reasonable intendment be considered as a contempt of the court commiting, but a ground of commitment palpably and evidently arbitrary, unjust and contrary to every principle of positive law or natural justice, he would look at it and act upon it as justice might require, from whatever court it might profess to have proceeded. It the case of *The People vs. Sturtevant*, the rule laid down by the court was that 'a party proceeded against for disobedience to an order or judgment is never allowed to allege as a defense for his misconduct that the court erred in its judgment. He must go further and make out that in point of law there was no order and no disobedience, by showing that the court had no right to judge between the parties on the subject.'"

In the case of *Commonwealth vs. Newton*, 1 Grant (Penn.) 453, the court said:

"The court having a limited jurisdiction in contempts, every fact found by them is to be taken as true, and every intendment is to be made in favor of the record, if it appears to us that they proceeded within and did not exceed their jurisdiction."

In the case of *Holman vs. State*, 105 Ind. 513, the supreme court, with reference to the force and effect to be given to the statement of the judge upon matters that occurred in court, said:

"As that statement is confined to matters that occurred in open session, and in the presence of the judge, we must treat it as importing absolute verity."

The fourth objection of the plaintiffs in error to the correctness of this judgment is, "that the facts stated constitute no offense, and no contempt of court."

Appellants contend that the offense, if such it was, committed by them against the court below, was not one for which they could be prosecuted in a contempt proceeding, because the acts alleged to have been committed were not contempt under the provisions of the act of March 2, 1831. It is contended that this act, which is now embodied in the provisions of § 725 of the revised statutes of the United States, is applicable to the courts of this territory and restricts the inherent power of the court in contempt proceedings and gives no power to punish as for the commission of a contempt in a case of this kind. This act of March 2, 1831, is not applicable to territorial courts and does not limit the inherent power given by congress to this court to punish contempts against its authority. The act of March 2, 1831, with reference to the courts to which it applies is as follows: "That the power of the several courts of the United States to issue attachments." * * * Now, are the district courts of this territory one of "the several courts of the United States," as contemplated by this act? That the territorial courts are not one of the constitutional courts as contemplated by this language, but are mere legislative courts, has been held both before and since the act of March 2, 1831. This was so held in the case of the *American Ins. Co. vs. Canter*, 1 Pet., 511-546, decided by the supreme court of the United

States in 1828; and it was so held in *McAllister vs. United States*, 141 U. S., 174, decided in 1891. And it has been so often held as to leave it no longer a question even for discussion. The acts which refer to the several courts of the United States do not apply to the courts of the territories; and such provisions are only made applicable to the territorial courts in such respects as they are expressly so made by act of congress.

The cases of *ex parte Robinson*, 19 Wall. 505, and *ex parte Terry*, 128 U. S. 289. are not in conflict with this holding. In neither of these cases was it held that this limitation on the inherent power to punish for contempt of court possessed by the United States courts extended beyond the circuit and district courts of the United States. The language in *ex parte Robinson* to the effect that this act applies to all courts should not be taken as a construction of the supreme court making it applicable to all courts within the United States, but should be taken in connection with the matter then under consideration, that is, the application of this act of congress to the courts of the United States. There can be no dispute that this act in terms does apply to all courts of the United States, but the United States supreme court suggested in the case of *ex parte Robinson* the doubt as to whether it could even be made to apply to the supreme court of the United States, because its powers were derived from the constitution. The determination in *ex parte Robinson* was no broader than this act applies to the circuit and district courts of the United States; and in *ex parte Terry*, to the circuit courts of the United States. A determination, however, that it applied to all courts of the United States, which is broader than that given it in these cases, would not make this act applicable to the territorial courts because they are not courts of the United States within the now well

understood meaning of this language in judicial decisions and acts of congress. The change of the language in § 725 of the revised statutes of the United States, in respect to courts to which this provision of March 2, 1831, is applicable, from "the several courts of the United States" in the original enactment to "the said courts" in the revised statutes in no way affects the contention. There is nothing in the language of the revision making any change in the courts to which its provisions are applicable, and nothing to indicate that congress intended to change the scope of this provision. Section 725, too, is contained in a chapter of the revised statutes which refers exclusively to United States courts and in no part or paragraph refers to territorial courts. In any event in the case at bar the contempt against the court was not committed while the court was exercising any of the jurisdiction given to the courts of the United States and which is by the Organic Act given also in the particular respects to the district courts of this territory. The record in the case shows that the court was sitting as the territorial district court of Oklahoma county, and not as a United States court for that county, when the contempt was committed. While the court was so sitting it was not in the exercise of any power, authority or jurisdiction of a United States court; and even if it should be held that the act of March 2, 1831, applied to the district courts of this territory when they were sitting in the exercise of the jurisdiction of United States circuit and district courts, it could not be so held when the court was sitting in the exercise of its common law jurisdiction as a territorial court.

The acts committed by the defendants in the publications of these articles do constitute a contempt of court. The acts of the defendants, both in writing the letter and in making the publications, were committed for the purpose of forcing, by the strong arm of the

public press, the judge of the court to make public a document which he had not adjudged could be received as an indictment or an accusation, and which he afterwards adjudged was not in proper form to be received as a report, as an accusation or as an indictment of the grand jury, and an instrument concerning which the court then had under consideration the question as to whether it should be accepted or returned to the grand jury with further directions.    It was a charge by strong implication, if not by direct statement, that the judge intended to withhold the report of the grand jury, and then charged that the withholding of the same "is an effort to brow-beat the grand jury." It contains a direct statement that the action which the court was taking was "an effort to bend the grand jury to the will of the judge. Such an attempt is a serious one, Judge Scott does not realize how serious," intending thereby to cast reflection upon the purpose of the judge in his consideration of the matter then before the court, and attributing a tyrannical and insincere motive to his action.    This matter was before the court for its consideration and had not been determined at the time these publications were made.    The fact that the court afterwards determined that the return or presentment or report of the grand jury could not be received, gave the court none the less jurisdiction of the matter and made it none the less a matter pending in court at the time the defendants sought to force a particular decision upon the question as to whether or not he would receive this report.    Cases are often determined by the court holding that the matter is not properly presented or that the court has no jurisdiction of the subject matter or proceeding.    This, however, is not a denial of the fact that the court had jurisdiction of the case or proceeding then pending.    The case or the proceeding is as much before the court and involves

as much of judicial action when the court holds that the matter is improperly presented, or even if the court has no jurisdiction of the subject matter of the action, as it is when the case is determined upon the merits. There was nothing improper or unusual in the court's taking time to consider whether an instrument presented by the grand jury should be accepted by the court. The court is not bound to receive and accept from the grand jury everything which it may present.

One of the legal and judicial steps to be taken before any return of the grand jury becomes an indictment, accusation or report, is that it must be presented to and received by the court, and the court has a right, before accepting and receiving it, to return it to the grand jury or to receive it as the court thinks proper. This required judicial action. The court being in session, being engaged in the trial of a case when this return was made by the grand jury, and it appearing upon such a hasty perusal as the court could then make, that it was out of the usual form, it was not only the power but it was the duty of the court to take the matter and give it fair and candid consideration before passing judgment upon its propriety and validity. Until it was received by the court it still remained among the secret proceedings of the grand jury, and one which neither the court nor the grand jury itself had a right to make public. The judge being engaged in the trial of a cause before a jury, and which must necessarily have required his attention at that time, the next day being a legal holiday, it was not at all improper for the judge to take the matter of receiving this report under consideration until Fedruary 23. Pending this consideration, it was not the judge's duty, indeed it would have been improper, for him to have permitted the report to have been published until he had concluded that it was in proper form

to be received, and until it had been received, as the report of the grand jury or as an accusation or as an indictment. If it were the latter, it would assuredly be improper to make its contents known by publication until the accused had been apprehended. Any other procedure would convert the newspaper from a beneficent avenue of public thought, intelligence and information, and the agency that has done more to speed the perfection of the proud and intelligent civilization of the nineteenth century than any other force in Christendom, into the warning sentinel of the felon. If the proceedings of the grand jury were to be published before indictments or accusations could be received, or even before warrants could be issued and arrests made thereon, "escape" would be the defendant's plea more often than "not guilty."

It is therefore the policy of the law that these matters should be kept secret until they have passed a certain stage of judicial investigation and official action, and the court's strict obedience to this policy of the law could furnish no ground for public criticism, anathema or villification, and especially when such charges were made for the purpose of influencing the court's action on a matter then pending. The language of exhibit "B" of the information: "If Judge Scott persists in carrying out the intention expressed to District Clerk Ebey of suppressing the report of the grand jury, the act may rightly be characterized as the most flagrant violation of the rights of the people ever undertaken in Oklahoma," was a direct and flagrant attempt by a newspaper publication to force the judge to receive from the grand jury and make public a document the proper form of which he was then judicially considering. The defendants show from these publications that they knew that the matter was under consideration; that they knew that the judge was seriously considering or questioning the

propriety of receiving this report. These articles were a newspaper attempt to influence judicial action. This is the most dangerous of all forces that may be brought to bear against the purity and sanctity of judicial action. To attempt to influence the decisions of the courts by scurrilous publications made during the pendency of a proceeding is more dangerous to pure and unbiased judicial action than an effort to break down the court by charges of wrong and infamy. The latter may affect the standing of the court in the community while not particularly affecting the court itself. The former may affect a judgment or a determination which the court should make unbiased and uninfluenced by anything save that which is presented in the cause. With the extraordinary kind of newspaper conduct indulged in by the defendants in this case it was high time for the court to purge this baleful influence from its forum by the severest punishment which a court could inflict, if necessary. The allegation of defendants' answer that these publications were made as a criticism and animadversion on the judge's action, but without any intention or desire to interfere with the offices of the court or to reflect upon the honor or integrity of the judge, in no sense presented a justification for their actions. As was said of such language in the answer of the defendents in the contempt case of the *People vs. Stapleton*, decided by the supreme court of Colorado, 33 Pac. Rep. 167.

"It would be a very pleasant way to dispose of this proceeding for us to accept those oft-repeated assurances that respondents did not intend or design, by their publications, to convey the impression that this court had been actuated by unworthy motives, or controlled by dishonorable influences, in the Connor case. But it would be an affectation of credulity on our part to profess to believe such assurances. It is the province of the court to interpret and construe written language." * * * "It is an elementary rule of construction that a writing consisting of common

words shall be interpreted and construed according to the ordinary meaning of the words employed. The articles complained of contain only common words, and it would be a perversion of their ordinary meaning to hold that the words as used were not designed to charge and impute unworthy motives."

If anything further than the language published was necessary to show the intention and purpose of the defendants in publishing these articles to ascribe to the action of the court dishonorable and corrupt motives and to attempt to influence the action of the court, it was shown by the defendants in open court, when this matter was under consideration, and when the court offered to exercise its magnanimity, even in the face of all the conduct of the defendants, if they would retract these improper publications, when the impropriety of their action was called squarely to their attention. With the falsity of the statements of the publications made being shown by the findings of the court, they stood up in open court and admitted their publication but refused to retract anything therefrom. To say, after such actions that the wrongful conduct and intention of these defendants was not manifest, is an affront to candor and intelligence. There is no question about the wrongfulness of the publications nor of the viciousness of the defendants' intentions.

We decline in this case to give character to a manufactured sentiment by joining in the too often repeated discussion of a perverted application of our benificent heritage of freedom of speech and liberty of the press. During these occasions, when crime stalks abroad cloaked in the garb of liberty, and when the assassin of our highest and noblest institutions of civil government would audaciously bid the hand of Justice bestow reward for punishment too long deserved, we are reminded of the historic words of Madame Roland: "Oh, Liberty, how many crimes are committed in thy

name!" and resolve that the shield of the innocent shall not be the weapon of the guilty.

The judgment of the court below is affirmed, with costs.

Scott, J., not sitting; all the other Justices con-curring.