# BRADY v. STATE.

No. A-11163.   May 24, 1950.

(219 P. 2d 267.)

White & Parris, Eufaula, and George L. Hill, McAlester, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., Hazen Green, Co. Atty., McIntosh County, Eufaula, Kirksey M. Nix, and Tom G. Haile, McAlester, and Milam M. King, Checotah, for defendant in error.

POWELL, J. Carl Brady, plaintiff in error, defendant below, was charged by information filed in the district court of McIntosh county with the crime of manslaughter, first degree, was tried before a jury on April 26, 1948, found guilty and assessed punishment of four years in the penitentiary. Appeal has been perfected to this court.

For reversal, some seventeen specifications of error are set out in the petition in error, but are argued in brief under seven propositions, as follows:

"1. Refusal of the court of the request of the defendant below to limit the argument of the attorneys for the State to the same number as the attorneys for the defendant below to two and that the court committed error in permitting three arguments of the State over the objections of the defendant.

"2. Misconduct of the special prosecutors.

"3. Refusal of the court to give defendant's requested instructions numbered 1 and 2.

"4. Error of the court in giving instructions numbered 6, 7, 8, 11 and 12.

"5. Error of the court in admitting incompetent, irrelevant, immaterial and prejudicial evidence over the objections of the plaintiff in error.

"6. Error of the court in refusing to admit evidence offered by the defendant below to which refusal of the court the defendant below duly excepted.

"7. That the evidence for the State was so glaringly conflicting that same was not sufficient to sustain a conviction herein."

The appellant was the night city policeman of Eufaula. The tragedy herein involved was the outgrowth of his arrest, or attempted arrest, of Joe Roy Williams, now deceased, and witness for the state, Bob Burton. The record discloses that appellant, who will hereinafter be referred to as defendant, was first informed against in justice court in the city of Eufaula, and upon preliminary hearing was discharged by reason of insufficiency of the evidence; that thereafter complaint was filed before a justice of the peace in the neighboring city of Checotah, preliminary hearing was waived, and the defendant was thereafter, and on July 21, 1947, tried in the district court of McIntosh county, but the jury failed to agree, and the court declared a mistrial, and on second trial defendant was convicted as first herein recited.

The county attorney of McIntosh county was assisted in the prosecution by three able special prosecutors, and the defendant was represented by able counsel. We have had the benefit of oral argument of several of the trial attorneys, and the Attorney General.

The pertinent portion of the information reads:

"* * * That Carl Brady on the day and year aforesaid, in the county and state aforesaid, did then and there knowingly, wilfully, unlawfully, wrongfully and feloniously, make an assault in and upon one Joe Roy Williams by means of a certain weapon, to-wit: a 45 automatic pistol which he, the said Carl Brady, without a design on the part of him, the said Carl Brady, to ef-

fect death, but in a heat of passion and in a cruel and unusual manner then and there and thereby inflicting upon the said Joe Roy Williams, certain mortal wounds, of which said mortal wounds the said Joe Roy Williams did, on the 17th day of November, 1946, die, in the Oklahoma Baptist Hospital at Muskogee, Oklahoma. * * *"

The theory of the state, from the evidence introduced by the state, seems to have been that the deceased did not commit a misdemeanor in the presence of the officer-defendant, that the deceased was not intoxicated, and therefore the defendant had no right without a warrant to attempt the arrest of Joe Roy Williams, and that deceased had a right, under such circumstances, to protest and resist being arrested, and at all events, even if legally arrested, that the defendant had no just grounds to fire on the deceased.

The theory of the defendant was that there was a lawful arrest and that the deceased resisted arrest, obtained possession of the defendant's pistol, refused to give it up, and that defendant shot only as a last resort to protect his own life.

We shall treat defendant's seven propositions in order as seems logical. Counsel contends, and they set out evidence of various of the state's witnesses to demonstrate and support their proposition, "that the evidence for the state was so glaringly conflicting that the same was not sufficient to sustain a conviction herein." We have examined this evidence most carefully. This case is close and presents difficulties, because we are confronted with the proposition that the record does as a fact disclose a sharp conflict in the evidence of the state's own witnesses involving the very material questions, (1) As to whether or not a misdemeanor has been committed by Joe Roy Williams, the deceased, in the presence of the defendant-officer at the time of the arrest or attempt-

ed arrest; and (2) whether or not in the resistance that followed the arrest or attempted arrest, the deceased was attempting to use or cause the defendant to believe that he was attempting to use, and thereby endangering defendant's life, the pistol deceased had gained possession of after he knocked or threw defendant to the pavement.

The evidence, on the other hand, of the defendant's witnesses concerning these material factual issues was consistent and was corroborated by a number of the state's witnesses.

We shall consider the state's evidence.

The state used 14 witnesses on direct examination, and two on rebuttal, and the defense used 14 witnesses. Concerning the material and important question as to whether or not the deceased committed a misdemeanor (that is, in this case, was he creating a disturbance or was he intoxicated in the presence of the defendant-officer, so as to make the arrest without warrant a valid arrest), Bob Burton, who was the companion of the deceased at the time of the tragedy, and who was arrested along with the deceased and who subsequently paid a fine for being drunk, testified:

"I was in the 69 Tavern with Joe Roy Williams and we went over there, and there is a cafe there—we just went in there and I was up in front talking to some guy. Joe Roy was kinda in the back end there, and he ordered some coffee, and he and the girl had a little argument, I don't know what it was about, what the argument was about, I didn't go back there, and she began to raise the devil with us, with him, and so we started out the door and got just outside the door and met Carl Brady—* * * So we were just outside the door and met him, and he said 'What are you guys doing?' We told him nothing, and he said well he was going to take us to jail, said we had raised enough hell around there,

and we started on out with him and got not quite half way out in the street and began to talk to him to get him not to throw us in."

On cross-examination, witness Burton testified in part:

"Q. Had you been drinking that day, Bob? A. Yes, sir. Q. Both of you? A. Yes, sir." [Witness later testified that they drank only a half pint of whisky over a period of hours that evening.] "Q. The first you heard was the girl talking? A. That's right. Q. How long after that commotion was it until you left the cafe? A. Well—you mean from the time the commotion started until we left? Q. Yes. A. Well, they just had a few words and it didn't last but three or four minutes, the argument didn't. I told Joe, I said, 'let's go.' He come right on out and we started out the door. How far did you say you had gotten out before you met Mr. Brady? A. Just outside the door. I would say three or four steps out. Q. When you met Mr. Brady? A. That's right."

Witness Burton further testified that he was placed in jail by Mr. Brady, which followed the cafe and street incident, and concerning this he was asked and answered as follows: "Bob, you did pay a fine for being drunk on that occasion, didn't you? A. Yes, sir."

Pauline Henson, another state's witness, testified that she was working as a waitress at the 69 Cafe on the night of November 16, 1946; that Joe Roy Williams came in between 11:30 and 12:00 p. m., and he and Jewell, the girl who ran the place, got in an argument. She handed him a cup of coffee and asked him to sit down, and he would not and she knocked the coffee out of his hand and he picked up the cream and started to drink it, and she knocked it out of his hand and pick up a ball bat and hit him across the back with it three times, and that he took the bat away from her, but in doing so it slip-

ped and hit her and she was awfully mad.. Witness further testified:

"She [Jewell] tried to get somebody to call the law and I think finally the dishwasher did call the law. I know he didn't have time to get the call until Carl Brady walked in and Joe Roy said 'Carl, I'll do anything you want me to do, just anything', and Carl took him by the arm and started walking out, and he walked by me and stopped and asked me if he had started anything either way, and I told him I couldn't say anything either way— I was just working there."

She further testified: "He wasn't drunk. I wouldn't say he was drinking or not, but I know he wasn't drunk."

On cross-examination, she testified in part:

"Q. There was a commotion going on in that place, wasn't there? A. Yes, I guess so. Q. You know there was, don't you? A. Yes, sir. Q. Who was that commotion between? A. Between Jewell and Joe Roy."

The evidence of Carrie Carr Hill given at the former trial was read. She testified substantially as Pauline Henson, and that she too was a waitress at the 69 Cafe at the time of the difficulty in question. She testified further:

"* * * And then he [Joe Roy] jerked this ball-bat out of her hand—he twisted it out of her hand and it kinda hit her on the back of the neck, and he taken that and leaned back up against a chair, and she asked for Mr. Brady to be called, and someone, the dishwasher, I believe, called Mr. Brady, and he was still standing there with the ball-bat in his hand when Mr. Brady went in—he was standing there laughing and talking. I wouldn't say the boy was drunk, he didn't act to me like he was—when Mr. Brady came in he said 'come go with me' and he said 'of course, Mr. Brady, I will go with you anywhere.' Q. And they left the cafe? A. Yes, sir."

Andrew Fenton testified for the state, that he came in the 69 Cafe after Joe Roy Williams was already there. He stated in part:

"Q. Did you see what, if anything, took place between Mr. Williams and the girl, Jackie, who was operating, or supposed to be running the place? A. When I went in they was arguing over a cup of coffee, I believe, or something, I don't know just what it was about—when I went in they was arguing. Q. What, if anything, did you see Mr. Williams do? A. She was trying to get him to go out and he said he hadn't done anything out of the way to go out for. * * * Q. She got a baseball bat, what did she do? A. She told him to go outside, and he said he hadn't done anything out of the way, and she started to hit him and, of course, he just caught the bat. Q. All right? A. Well, she told him to go on out and he said he hadn't done anything out of the way, he would go out when he got ready, she said 'I'll bet you go out' and she went back in the kitchen where they do all the cooking and got a little old pistol, I didn't pay much attention to it. She told him to go on outside. He just sat there. And about that time Mr. Brady come in. She told Mr. Brady to take him outside. Mr. Brady told him, 'Come on, let's go.' And they just walked on the outside."

This completed all of the state's evidence directly concerning the validity of the arrest. And based solely on the weak and unsatisfactory evidence of the involved witness Burton, which evidence, as above demonstrated, was contrary to that of the other three of the state's witnesses, the court considered the question as to whether or not a misdemeanor was in fact committed by Joe Roy Williams in the presence of the arresting officer at the time of the arrest or attempted arrest, as sufficiently questionable as to require such issue to be submitted to the jury, and over the objection and exception of the defendant instructed the jury as follows:

"No. 6. You are instructed that under the constitution, statutes and the laws of the State of Oklahoma, a city policeman is a conservator of the peace, and it is his duty as said officer to take cognizance of all infractions of the city ordinances, and state laws, and, if an offense has been committed in his presence, then it is his duty to make an arrest.

"Therefore, you are further instructed that under the laws of this state no officer may arrest a person for a misdemeanor without a warrant of arrest for such person unless the misdemeanor is committed in the presence of the officer and at the time of such arrest, and any officer making an arrest for a misdemeanor, not committed in his presence and without a warrant, is a trespasser and the person sought to be arrested is not obliged to submit to the arrest, and such an arrest is an illegal one. Furthermore, under such conditions, the officer has no right to prevent an escape and, in preventing such escape or attempted escape, the officer would still be a trespasser.

"And, in this connection, if you should find and believe from the evidence beyond a reasonable doubt that the arrest or attempted arrest of the deceased by the defendant was made or attempted to be made without a warrant and without the deceased having committed a misdemeanor in the presence of said defendant, and at the time of the arrest or attempted arrest, then you are instructed that the deceased has a right to resist such arrest or attempted arrest by the defendant."

Defendant contends that there was no evidence to justify the above instruction, and that said instruction tended to place the burden of proof on him to establish that he made a legal arrest.

Considering the evidence recited, it is apparent that in giving the instruction complained of, the court disregarded the question of the intoxication or nonintoxication of witness Bob Burton, who admitted that he and the deceased had drunk a half pint of whisky between them, and disregarded his testimony that he had pleaded

guilty to being drunk on this occasion and had paid a fine, and disregarded the evidence of the other three disinterested state's witnesses who testified that the arrest of the deceased and of the witness Burton was made inside the 69 Cafe during the disturbance, rather than outside after the disturbance was over, as testified to by Burton.

It is, of course, fundamental that it is incumbent upon the prosecution to establish each and every material element of the crime charged and every fact and circumstance essential to the guilt of the accused by the evidence beyond a reasonable doubt. Crouse v. State, 39 Okla. Cr. 127, 263 P. 681; Voegeli v. State, 75 Okla. Cr. 420, 133 P. 2d 219; 22 C.J.S., Criminal Law, § 566; 20 Am. Jur. § 149. But this court cannot overlook the well established rule that it will not substitute its judgment as to the weight of conflicting evidence and credibility of witnesses where there is evidence reasonably tending to support the verdict. Edwards v. State, 87 Okla. Cr. 399, 198 P. 2d 656. However, as contended by the defendant, we have found in the cases examined and where this basic rule has been adhered to, that the conflict in the evidence seems to have been between the evidence of witnesses for the state and witnesses for the accused, rather than involving a conflict in the evidence of the state's witnesses. The question raised as to whether or not the above rule would apply in the situation here presented is not without merit, for we find that this court in a number of cases has reversed convictions where on the part of the state the evidence for conviction came wholly from the testimony of two witnesses of equal credibility, one testifying to the guilt and the other to defendant's innocence. Clark v. State, 65 Okla. Cr. 56, 82 P. 2d 844; Jackson v. State, 12 Okla. Cr. 446, 158 P. 2d

292. See, also, involving the principle: Morris v. State, 30 Okla. Cr. 382, 236 P. 443.

Considering the evidence of Burton alone, we do not find it of that quality that would justify instruction No. 6, and at all events the burden of proof resting on the state, the evidence of one interested state's witness was certainly overcome by the evidence of three disinterested state's witnesses, and did not make tenable the state's theory concerning the arrest, and in view of the Clark and Jackson cases, supra, we hold that it was error on the part of the court to submit to the jury the issue involved in instruction No. 6.

From what has been said, it follows, therefore, that the state having established by its witnesses that the defendant was justified in arresting the deceased, it was also error for the court to submit the issue by giving that part of instruction No. 7, which was objected and excepted to by defendant, and reading:

"* * * And, in this connection, you are instructed that if you find and believe from the evidence that the deceased, Joe Roy Williams, was in an intoxicated condition on the day and date and time and place alleged in the information, or that he committed the act of disturbing the peace, in the presence of said officer, as defined herein, or entertain a reasonable doubt thereof, then you are instructed that it was the duty of the defendant, Carl Brady, to arrest him and incarcerate him in order that he might be tried under the laws of the State of Oklahoma, and if the deceased resisted arrest, then it was the duty of such officer to use such force as was reasonably necessary to make said incarceration."

We shall now consider the state's evidence concerning the second inquiry. Concerning the second issue as to whether or not in the resistance that followed the arrest or attempted arrest, the deceased was attempting to

use or caused the defendant to believe that he was attempting to use (and thereby endanger his life), the pistol deceased had gained possession of after he knocked or threw defendant to the pavement, Bob Burton testified on direct examination:

"A. We got a little over half way across the street, we all three of us stopped there talking and Joe Roy said 'I would like to pay a fine if that's what you want' and he said he wouldn't accept it, and he jerked us— Q. Who did he jerk? A. He jerked both of us, had one in each hand, and I kinda stepped back and kinda pulled away and him and Joe Roy went into a kind of a little tussle. Q. Now, Bob, while you were scuffling there, did you at any time see any weapon or firearms or gun of any kind? A. Not right at the time. Q. What happened after they went into the scuffle? A. It only lasted about a second and he raised up and a gun fell out in the street. Q. Gun? What kind of a gun was it? A. Revolver. Q. What happened to the gun? A. Joe Roy picked it up."

Witness further testified that he thought Joe Roy was going to hand the revolver back to Brady, that he "had it about the middle of the gun", about the cylinder, and that about that time Ross Wortham, manager of the 73 Tavern (which was right across the street east of the 69 Cafe), came out, went back in the cafe and came out the second time with a towel in his hand and walked directly up to Brady and kind of ran into him and then went back into the tavern. Witness further testified:

"Q. What happened then? A. Brady turned around, said 'Come on' and about that time they were standing there talking, Joe Roy and Brady, and he come out with a gun— Q. Who did? A. Brady—had a .45—he had it kinda in his belt. Q. Was that after Wortham came out or before? A. After."

Witness stated that Brady then commenced shooting at Joe Roy, and that after the first shot Joe Roy

started going down like he had been hit in the right leg; that Brady fired about five shots, and then came over and snapped his gun at witness and said: "Let's get going," and took witness to the city jail. This witness testified on cross-examination:

"Q. Now, the first little difficulty you had with Mr. Brady occurred about the middle of the street, is that right? A. No, it wasn't quite in the middle. We was just outside the door, I don't think it was half way to the street. Q. What brought that about? A. Because we didn't want to go to jail. Q. I see. And did you jerk loose from him, or anything there? A. I pulled loose after he jerked me. Q. By the way, how much do you weigh, Bob? A. Approximately 200. Q. How tall are you? A. Six feet. Q. Do you recall whether you were as large as Joe Roy or not? A. He was about the same size. Q. You were both about the same size? A. Yes, sir. Q. After you pulled away from him, what happened? A. We wanted to buy off from going to jail, pay him a fine, but he wouldn't accept it. Q. He told you he would have to take you on to jail, is that right? A. That's right. Q. Then how far did. you go until something else happened? A. A little over half way across the street on the east side of the highway. Q. What happened then? A. They had a little scuffle there, Brady and Joe Roy. Q. *Did Mr. Brady go to the ground?* A. *No, sir.* Q. He never did fall down? A. *No, sir; he was in about a half way stooped position.* Q. .Did you see any blood or anything on Mr. Brady that night? A. *No, sir, if he had any on him I didn't see it.*"

Virgil Fairchild, a witness for the state, testified concerning the difficulty in the street involving the deceased, Bob Burton and the defendant, that he, with Virgil Nichols, Herman Fairchild and Ralph Ott, shown to be young men, were riding around the night of November 16, 1946; that they were in the 73 Tavern and witness saw Joe Roy Williams and Bob Burton there; that Joe Roy got a cup of coffee and witness and his companions

got in his brother Herman's car, drove around a while and came back and parked in front of the 73 Tavern; that Joe Roy's truck was parked the other side of their car; that he saw Joe Roy and Mr. Brady, the defendant, coming from the 69 Cafe, and that: "Joe Roy told him if he done anything he would pay his fine"; that Mr. Brady told him he was going to jail; that "Joe Roy pulled loose from him and Mr. Brady came back and caught hold of his arm and Joe Roy threw him down then." Witness was asked:

"Q. Right at that point, up until that time, had you seen anybody with a gun in their hands? A. No, sir. Q. Joe Roy pulled loose from him, you say, and Mr. Brady came back and took hold of him again? A. Mr. Brady had a gun when he come back after him a second time."

Witness was asked what happened then, and answered that Joe Roy threw him down. He was asked:

"And what then is the next thing you saw after you say Mr. Brady was down? A. Joe Roy walked over by him and picked up his gun and came back and helped him up. . . . Q. Did he do anything else? A. Pulled a handkerchief out of his pocket and wiped blood off his nose. Q. What was the next thing you saw? A. Joe Roy gave him his gun back and started to walk off."

He stated that at this point Mr. Brady shot Joe Roy, shot at him five or six times; that he heard no other firing. *He stated that Mr. Wortham, the cafe man, came out before the shooting started but that he did not go up to either of the parties,* and was in the tavern calling the officers when the shooting was going on.

On cross-examination witness testified that Joe Roy threw the defendant down and defendant kind of fell on his face; that defendant was flat on the ground and had blood on his nose when he got up; that Ross Wortham

did not talk to either of the parties or go near them; *that he was positive that Joe Roy never fired a single shot.*

Herman Fairchild testified substantially as his brother, except he stated that after Joe Roy slung the defendant down that he headed for his truck and then came back and helped the defendant and wiped blood off defendant's face; that he saw a gun in Joe Roy's hand and that witness hurried in the tavern and got behind the icebox as the shooting started. He did not see the shooting.

Ralph Ott testified that Joe Roy either knocked or threw the defendant flat on the pavement, he could not tell; that he noticed Joe Roy with a gun in his hand; that defendant had blood on his face; that Joe Roy gave the gun back to the defendant and that the defendant had two guns when the shooting commenced; that witness and his companions went into the Tavern, that he got out of the car after the first shot was fired. The record indicated that on preliminary hearing this witness testified that he and his companions stayed in the car until the shooting was over.

Virgil Nichols testified that he saw Mr. Brady bringing Joe Roy across the street with Bob Burton following; that Joe Roy jerked loose twice and the second time Brady got out his gun and Joe Roy took hold of his wrists and threw him to the ground; that Joe Roy got Brady's gun and had it kind of behind him, wiping the blood out of Brady's eyes with his other hand, and he thought Joe Roy handed Brady his gun and started walking sideways to his car, and that Brady opened fire and he did not know whether Joe Roy fired or not. He further testified:

"A. Let me tell you, we got out of the car and went into the 73 and were looking out the door there, before the shooting started. We were in the 73 and standing in the door looking out when the shooting started. Q. You were out in the street? A. No, standing in the door. Q. Where was Ross Wortham? A. Trying to call the law; *he was trying to call the law when they were wrestling and then right at the time the shooting was going on.*"

Billy Gene Grider testified that he was in the Tavern with a friend who got up and looked out of the window and said, "Looks like they are having trouble;" that he looked out and saw the defendant fire on Joe Roy and saw Joe Roy fall and witness then ducked behind the window.

Charles Bussey testified that he was in the 69 Cafe when the shooting commenced and that one shot came right over his head and that he then knelt on the floor, and that he did not see the shooting but heard it; that from his experience with firearms he would say only a .45 calibre gun was fired; that five or six shots were fired. He further testified that he was in the 69 Cafe for 15 or 20 minutes before the shooting, and said: "I didn't see any disturbance—didn't pay any attention to it."

Although there was conflict between the state's witnesses and even conflict in the testimony of individual witnesses given either at preliminary or on former trial, in certain particulars, we conclude that the state's evidence justified the inquiry as to whether or not the defendant used more force than was necessary in his attempt to disarm and subdue the deceased, and whether or not defendant shot deceased in his own necessary defense.

On behalf of the defendant, Doug White testified that he and O'Dell Jones were in the 69 Cafe when Bob Burton and Joe Roy Williams came in. He stated: "I

just noticed them drinking, and a little loud." Witness and Jones soon went across the street to the 73 Tavern. He testified that later on, coming out of the 73 Tavern, he noticed trouble.

"Q. Tell the jury what you saw there. A. Well, as we started out the door, I saw Roy had his back to the 73 Tavern with a gun in his hand, with both hands behind him. Carl was kinda wobbling around, blood running down his face. We walked on across the street and turned around and stood there and watched. I heard Roy first say 'I haven't done anything.' I heard Carl say, 'Get on down there', and they kinda circled off from one another and started firing. Q. Do you know whether both men were firing? A. Both were firing. Q. Do you know how many shots were fired? A. I would say 10. * * * Q. Do you know whether Carl was shot on that occasion? A. Well, Carl flinched. So far as being shot, I wouldn't know—he kinda staggered back one time."

Witness further testified that he and his companion were also drinking when in the 69 Cafe; that the state subpoenaed him for the preliminary hearing and for the other trial, but did not use him.

O'Dell Jones testified substantially as Doug White. He was asked:

"Q. Anything attract your attention when they [Joe Roy and Bob] came in? A. Well, they just come in, seemed in a right mood, maybe, to have a little trouble, a little loud and making their way."

Witness further stated with respect to the later difficulty in the street that 10 or 12 shots were fired. On cross-examination the state tried to show that witness had seen a .45 automatic in Ross Wortham's cash register some time before, but witness denied this.

George Scott testified that Joe Deere and Bob Burton picked defendant up after Joe Roy slung him to the

pavement and that they wiped the blood from defendant's face.

John H. Dalgarn and Fuller Gray testified to defendant being thrown down by the deceased, and that deceased got one of defendant's guns and that both fired about the same time.

Virgil Blair, constable, testified that about 10 to 15 minutes after the trouble they were fixing to take defendant to the hospital and that he took a .45 Colt Automatic and a .32.20 revolver from defendant and gave them to Chief of Police Casey. And Deputy Sheriff Tom Barton testified that each firearm was full of empty shells.

The defendant Carl Brady testified that some one 'phoned him to hurry to the 69 Cafe where they were having trouble. That he arrived there about three minutes later, and found Bob Burton sitting on the end of a stool at the west end of the counter. He further testified:

"A. Joe Roy Williams was sitting right opposite him on a booth table with a ball-bat in his hand, waving the ball-bat around, and the lady running the place was standing behind the counter crying, and told me to take them out, that they had caused enough trouble in there. I promptly placed the boys under arrest and started out with them. Q. What was their condition with reference to whether or not they were drinking? A. They were both drinking pretty heavy. Q. Go ahead and tell what happened then. A. We started across the street and got somewhere near the middle of the street; they both wanted to know where we were going. So I told the boys I would have to take them over to the city jail, that I got a call from them, and they said: 'Hell no, we are not going, we will pay a fine, but we are not going to jail.' So I told the boys I couldn't fine them, they would have to go to jail and the police judge would have to assess the fine, but if they would go and stay a while

then I could let them put up bond and let them go on home, but Joe Roy jerked loose and said he wasn't going. So I got hold of them a second time. The second time he grabbed me, threw me around directly to where Bob Burton was behind me. That's the last thing I remember until I was coming to on the pavement. I had been hit in the back of the head—a ridge up and down this way— * * * I had been hit in the back of the head. When I came to, just as I was coming to, I heard a thud—sounded like a shot to me—that led me to believe that's when he hit me across the nose with my revolver. * * * Q. Go ahead. A. When I got up—as I became settled, trying to get up, some of the boys, Bob Burton was standing on my left, so one of the boys helped me up—I reached to get my handkerchief to wipe the blood out of my nose and face, and Bob Burton pulled his handkerchief out and assisted me in wiping the blood out of my face and eyes. I pulled my glasses off to get the blood off of them, but left them off, the left lense was broken and gone and I just stuck them in my pocket. So after I stood around there a little bit, kinda regained consciousness, I asked Burton if he had my gun. He said, 'No, I haven't got it, but I know who has.' I turned to Joe Roy and asked him. He said, 'No, I haven't got it.' I said 'Who has?' He said, 'I seen a boy pick it up and run across the street with it.' All of that time he was standing with the gun in his hand behind him. Just as I was coming to I heard Bob tell Joe Roy, 'Don't do that, give me that gun.' That's why I knew he had it. So, I just stepped around Ross Wortham—he had came out there trying to get me to go in the 73. I told him I would be all right—I stepped around him and pulled this automatic and told Joe Roy I had another gun, that he was going to jail. And by that time he came out with this gun and stuck it towards my midsection, and I jumped back and he jumped to his left, and we both fired about the same time, and from that time on the shooting started. Q. Were you shot on that occasion? A. His second shot hit me in the shoulder, right in here (indicating left shoulder). Q. Now, Carl, did you know whether or not Joe Roy was hit until it

was all over? A. I didn't know he was hit until he fell out there in the middle of the pavement. Q. What did you do after the shooting was over. A. As soon as he settled down kinda on his right side, I ran over and kicked the gun out of his hand. Q. What position did he have it in? A. He was still trying to raise the gun up like he was trying to shoot. I didn't know whether it was loaded or not. I kicked it out of his hand and picked it up, put it in my holster, and put my gun under my belt, walked around the pick-up setting there and told Bob Burton I was going to take him to jail and he went with me. And, on the way over he said: 'I was trying to help you' and I said, 'Damned if you wasn't.' That's all of the words that were said. I locked him up for being drunk and disturbing the peace. Q. Where did you go then? A. Directly back ot the 73 Tavern. A truck driver drove up during the time the shooting was going on. He got out and came on over—he saw me take this boy over to the jail. He came over and told me he had been in the medical corps in the army and if he could assist me in any way he would be glad to. I told him I was hit in the shoulder but didn't know whether he could help me or not. Q. Did you receive medical treatment that night? A. Yes, they taken me on in the 73 Tavern, spread a coat or blanket down, laid me down, taken my coat and short and everything off. Doctor Dickey got there about that time, put a little bandage over that and give me a hypo and sent me to the hospital. Q. How long were you there? A. Eleven days. It was five days before they taken the bullet out. Q. Did they operate and take the bullet out? A. Yes, the fifth day. I had a temperature—they couldn't operate on me there for five days."

The difficulty in the street was corroborated in many important particulars by Ross Wortham, the 73 Tavern owner, as well as other witnesses. The state offered two former waitresses at the 73 Tavern in an attempt to show that Wortham was 'phoning all the time the difficulty was going on and did not have opportunity

to see the difficulty, but Wortham's evidence was corroborated by witness, Fuller Gray, and other witnesses in important particulars. The greatest discrepancy in the testimony of the defendant's witnesses was as to who wiped the blood off defendant's face, prior to the gun play. Some did not know, some thought Bob Burton did, one was positive it was John Deere and Bob Burton, while one thought the deceased helped in this.

Counsel for defendant contend that the court failed to properly instruct the jury on their theory of the defense, and that the court erred in failing to give their requested instructions Nos. 1 and 2. We have examined the requested instructions and find that requested instruction No. 2, if the court had given it, would have been a proper instruction covering the charge in the information, but that the instructions as a whole fairly cover the subject of that requested instruction. But it is set out under defendant's assignments of error III and IV that: "* * * the court did not in his instructions to the jury properly define the duties and rights of peace officers," citing Tit. 22 O.S. 1941 § 193, and "that the instructions in this case taken as a whole * * * rather tended to instruct solely upon the theory of self-defense between two combatants, neither of whom is an officer."

An examination of the instructions given discloses that Nos. 8, 9, 10 and 11 do involve self-defense between two combatants, neither of whom is an officer. Instruction No. 7 in part mentioned arrest by a peace officer, but we have herein held that instruction erroneous by reason of that portion of the same we have previously quoted herein.

Instruction No. 12 so far as it went did cover defendant's theory, except in the first portion it, too, predicated it on the jury first determining whether the defend-

ant placed the deceased under arrest upon a charge of a misdemeanor actually committed in his presence, when from what we have said heretofore, the state did not as a matter of law introduce evidence to justify that issue, and hence the instruction was in such respect erroneous, and the defendant was entitled to an instruction more precisely defining the duties, rights, and liabilities of a peace officer in making an arrest in a misdemeanor case where the accused is arrested and resists arrest. Defendant's requested instruction No. 1 would have been a proper instruction under the facts developed in this case. See Tit. 22, § 193, supra, and Evans v. State, 89 Okla. Cr. 218, 206 P. 2d 247, covering arrest by a peace officer.

Counsel for defendant contends that the court violated the terms of the statute, Tit. 22 O.S. 1941 § 835, in permitting three counsel to argue the case to the jury on behalf of the state, while the arguments for defendant were limited to his two attorneys. The state was represented by the county attorney and three special prosecutors. The defendant was represented by two attorneys at trial.

Section 835, supra, provides:

"If the indictment or information is for an offense punishable with death, three counsel on each side may argue the case to the jury. If it is for any other offense the court may, in its discretion, restrict the argument to one counsel on each side."

In this connection see Tit. 22 O.S. 1941 § 831, which, in part provides:

"6. Thereupon, unless the case is submitted to the jury without argument, the counsel for the State shall commence, and the defendant or his counsel shall follow, then the counsel for the State shall conclude the argument to the jury. * * * The court may permit one or more counsel to address the jury on the same side, and

may arrange the order in which they shall speak, but shall not without the consent of the attorneys limit the time of their arguments. * * *."

There is no contention that the court permitted the state more time to present its case than was allowed the defense, and we have found nothing in the record to indicate that the court abused its discretion in permitting three attorneys to address the jury on behalf of the state.

Counsel for defendant complain of the tactics of the special prosecutors in persisting in trying to get incompetent evidence before the jury, particularly where Leo Williams, brother of the deceased, testified that his brother on November 16, 1946, lived with his wife and two children. The court had not permitted witness to answer to the question propounded by Mr. Haile: "Of whom does his family consist?" But the prosecution reframed the question so as to obtain an answer. The question was of course improper. Burton v. State, 16 Okla. Cr. 602, 185 P. 842. The question might have boomeranged, however, in view of the difficulty in the cafe.

Counsel complain of the effort of the special prosecutors to show by innuendo and by questions that defendant's witness Ross Wortham had a .45 automatic pistol in the cash register of his tavern just prior to the shooting and of unfair tactics in trying to support Bob Burton's testimony that Wortham came out of the cafe just prior to the shooting with a towel in his hand and as though something was wrapped in it, and rushing up to defendant as though he handed him something, following which the defendant started shooting. Bob Burton was the only witness for the state or defense whose testimony supported the idea that Wortham might have handed the defendant something. No evidence was introduced by the defense to support the questioning of

Wortham and others about Wortham having had a .45 automatic in his tavern just prior to the difficulty, and the state to demonstrate good faith should have introduced evidence to support this theory, or have refrained from persisting in that line of cross-examination.

Complaint is made of the argument to the jury by the special prosecutors, based on improper questions, but the argument does not appear in the record. Also, many of the questions were not objected to. In Scott v. State, 80 Okla. Cr. 259, 158 P. 2d 728, 729, this court held:

"Where the argument of the county attorney is not taken down in shorthand and embodied in the record in full, and a dispute arises as to what was said in argument, Criminal Court of Appeals will follow the finding of the trial court recited in the record as to what occurred."

See, also, Bingham v. State, 82 Okla. Cr. 5, 165 P. 2d 646.

Some of the argument complained of might have been as harmful as helpful to the prosecution.

This was indeed a tragedy that in retrospect one might conclude could have possibly been avoided. We find at the bottom exuberant and vital youth fired up by that fuel that is the force behind most of the tragedies daily reported in the press, the force that is the deciding and adverse weight in split-second decisions involving life and death, and being liquor. It may be that the young woman shown to be so handy with the ball-bat and with her small pistol was at fault and that she was the one who by use of poor judgment set in motion the chain of events leading to the death of Joe Roy Williams. We do not know, and such inquiry has no part in this case. The record is conclusive that she and the deceased did

have trouble in her cafe and that the defendant officer in answer to a call of duty arrived on the scene while the cafe operator was trying to eject the deceased and his companion, Bob Burton. The evidence of the state alone conclusively shows that said persons were at least to some extent under the influence of intoxicating liquor. The record without reference to the defense evidence, is compelling and conclusive that there was lawful arrest of both witness Bob Burton and of the deceased. It was reversible error to submit this issue to the jury. The issue for the jury in this case, under proper instructions outlining the rights and duties of a peace officer, was to determine whether or not in the admitted resistance that followed the arrest of the deceased, the arresting officer used more force than was reasonably necessary in his attempt to disarm the deceased, if he was armed, or to subdue him, whether he was armed or not. The defendant is therefore entitled to a new trial.

For the reasons hereinabove stated, the judgment of the district court of McIntosh county is reversed, and the case remanded for a new trial consistent with the views herein expressed.

JONES, P. J., and BRETT, J., concur.