John W. YOUNG, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–11898.

Criminal Court of Appeals of Oklahoma.

Sept. 8, 1954.

Supplemental Opinion on Rehearing Oct. 20, 1954.

362 ■ 

David Young, Glenn O. Young, Young, Young & Young, Sapulpa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

The plaintiff in error, John W. Young, who will hereinafter be referred to as defendant, was adjudged by the district court of Creek County to be guilty of a direct contempt, and was sentenced to pay a fine of $100, or to be confined in the county jail until such fine was paid.

The written order of the court, from which appeal has been perfected to this court, was filed in the district court of Creek County in case No. 28709, styled: "In re: Contempt Proceedings against John W. Young and Heber Finch, Sr.", on January 12, 1953. The body of the order reads:

"Now on this 22nd day of December, 1952, while the district court of Creek County was regularly in session, John W. Young and Heber Finch, Sr., were engaged in physical combat, to-wit: Fighting in the Court Room, which disturbed the orderly process of the Court.

"Both parties were brought before the Court by the Bailiff and informed that each of them appeared to be in Contempt of Court; and were asked by the Court, individually, if they had any reason to state why they should not be found in Contempt of Court. Neither having stated satisfactory reasons for not being found in Contempt of Court, in answer to such response, the Court assessed a fine against each of the above named parties in the sum of $100.00 and ordered both parties committed to the County Jail until such fine was paid or they had purged themselves of Contempt.

"On objection thereto being made by the parties, the execution of such sentence was stayed until January 8, 1953, and each of the parties were advised that they would have an opportunity to present evidence at that time to show the Court why they should not be found in Contempt for their fighting in the Court Room.

"On January 8, 1953, such evidence was heard on behalf of both parties and the matter was passed for further

hearing until January 10, 1953, at which time after all the evidence was presented, both parties stated that they had no further evidence to present.

"The Court overruled the Motion of John W. Young to Vacate the Judgment of Contempt and found that both of the parties were guilty of fighting in the Court Room, which disturbed the orderly process of the District Court of Creek County, Oklahoma, and ordered each party fined in the sum of $100.00 and the costs of the proceedings; that each party pay the costs incident to the calling of his own witnesses, and that the other costs incident to the case be divided evenly between the two parties.

"It was further ordered that each of the parties be committed to the County Jail until they purge themselves of such contempt.

"Whereupon, John W. Young gave notice of appeal, the Court allowed 30-10 and 5 in which to make and serve casemade and set the appeal bond at $500.00, and allowed John W. Young 5 days from January 10, 1953, in which to make said Appeal Bond.

"/s/ Kenneth Hughes, District Judge, Creek County Oklahoma."

The record reflects that when the above order was made Mr. Blakemore, attorney for Heber Finch, Sr., announced in open court: "Let the record show that Heber Finch, Sr., has paid the Court Clerk $100.00."

The record further discloses that thereafter on January 16, 1953, the defendant Young filed a motion for new trial, which was on the same day overruled and exceptions noted. The defendant Young has duly perfected an appeal to this court, and there is not involved an appeal by Heber Finch, Sr.

For reversal the defendant sets out and urges in his brief some eight specifications of error based on assignments in his petition in error, the gist of which are:

(1) That the judgment of the court is void upon its face for the reason that it fails to specify any limitation as to the time the defendant is to serve in county jail to purge himself of contempt.

(2) That the judgment is contrary to law in that the evidence disclosed that at the time defendant was cited for contempt that he was defending himself from an assault by Heber Finch, Sr., and that defendant was not in any way disrespectful to the court.

(3) That the order entered by the trial court at the conclusion of defendant's motion for new trial, fining defendant Young $100.00 and costs, including witness costs, and committing defendant to the county jail "until they purge themselves of contempt" is void for uncertainty and in excess of the court's jurisdiction, and violates the Constitutional restrictions against imprisonment for debt.

(4) That the judgment is void for the reason that it was rendered without affording defendant Young his constitutional right to be heard before imposition of punishment for contempt.

(5) That the judgment is void for the reason that under said judgment the defendant is sentenced jointly with another and cannot purge himself of contempt.

(6) That the order filed January 12, 1953 violates the double jeopardy provision of the Constitution in that it shows on its face that the defendant Young was placed two times in jeopardy for the same offense.

(7) That the order should be reversed for the reason that the trial judge served as both prosecutor and judge and the prosecution was not carried in the name of the State of Oklahoma.

(8) That no intent on the part of Young to commit the crime of contempt was shown.

The statutory provision applicable to this case is Tit. 21 O.S.1951 § 565, which, in part reads:

"Contempts of our court shall be divided into direct and indirect contempts. Direct contempts shall consist of disorderly or insolent behavior committed during the session of the court and in its immediate view, and

presence, \* \* \* *and any breach of the peace, noise or disturbance, so near to it as to interrupt its proceedings,* shall be deemed direct contempt of court, and may be summarily punished as hereinafter provided for. \* \* \*" (Emphasis supplied.)

Section 566 of the above Title also provides:

"Punishment for contempt shall be by fine or imprisonment, or both, at the discretion of the court."

■ Considering first the defendant's contention that he was not afforded a hearing prior to imposition of the punishment, if the record would sustain this assignment of error, the case would have to be reversed, for in the early case of Ex parte Sullivan, 10 Okl.Cr. 465, 473, 138 P. 815, Ann.Cas.1916A, 719, this court in construing the above statutory provisions, held, syllabus 1:

"Contempt—Constitutional Law— Due Process. Under that clause of section 25 of the Bill of Rights, providing, 'In no case shall a penalty or punishment be imposed for contempt, until an opportunity to be heard is given,' an opportunity to be heard before a penalty or punishment is imposed for contempt is an indispensable essential to the administration of due process of law as contemplated by the constitutional inhibition that 'No person shall be deprived of life, liberty, or property, without due process of law.' Section 7, Bill of Rights."

■ In the body of the opinion, 10 Okl. Cr. at page 479, 138 P. at page 821, Judge Doyle, speaking for the court, said:

"That clause of section 25 of the Bill of Rights in question does not prescribe any form, nor require any characterization of the act charged as a contempt in order to confer jurisdiction, but it does require that an opportunity to be heard must be given before a penalty or punishment is imposed for contempt. In the absence of some requirement of the statute prescribing the manner or mode of hearing, in order to confer jurisdiction on

the court to punish for contempts, committed in the presence of the court, *we think that it would be sufficient if the contemner be arraigned and asked whether he has any legal cause to show why he should not be adjudged guilty of contempt of court."* (Emphasis now supplied.)

■ Also in the case of Ex parte Dawes, 31 Okl.Cr. 397, 403, 239 P. 689, 691, with reference to procedure in a direct contempt case, it is said:

"In cases of direct contempt under the constitutional and statutory provisions, the contemner being present in court, neither a formal charge against him in writing or process is required; only an opportunity to be heard is given. No record is made other than the judgment, in this, as the statute provides, 'the substance of the offense shall be set forth in the order for his confinement, and made a matter of record in the court.' Section 1700 C.S. 1921 [Tit. 21 O.S.1951 § 568]. This provision can only mean that the order of commitment must contain a recital of those facts which make it a direct contempt, and is mandatory in its terms."

■ Also in the case of Deskins v. State, 62 Okl.Cr. 314, 323, 71 P.2d 502, 507, referring further to procedure in a direct contempt case, this court said:

"Since the court acts upon view and hearing, no witness need be sworn nor formal evidence taken. The court in its discretion renders judgment imposing such punishment as it may deem proper within the limits prescribed by the statute. No record is made other than the judgment, in this, as the statute provides, 'The substance of the offense shall be set forth in the order for his confinement, and made a matter of record in the court.' "

■ Further, in the case of Moss v. Arnold, 63 Okl.Cr. 343, 75 P.2d 491, 493, in paragraph twelve of the syllabus, we held:

"Where contempt is direct, in the immediate presence of the court, sum-

mary punishment may be imposed without a formal charge in writing. In such cases, formal entry showing the proceedings constitutes the full record. Nevertheless, the court may adopt such mode of trying the question of contempt as it deems proper, only so that the person charged may be given opportunity for explanation and defense."

This court has also in a number of cases held that in a proceeding for contempt of court, if the contemner is found guilty, the punishment imposed is a sentence in a criminal case. Such adjudication is a conviction, and the commitment in consequence thereof is in execution of sentence for a criminal offense. See Burnett v. State, 8 Okl.Cr. 639, 129 P. 1110, 47 L.R.A.,N.S., 1175; Deskins v. State, supra; Moss v. Arnold, supra.

The record herein reflects but one final order disposing of the contempt matter, which was the order or commitment entered on January 12, 1953, and heretofore quoted. There was a written order entered on January 7, 1953 by the court in which the clerk was directed to open a case on his appearance docket in the next consecutive number for the direct contempt matter here involved.

It will be noted from a reading of the order that the court recites *that the parties engaged in the disturbance were in fact brought before the court and asked individually if they should not be found in contempt of court,* and that neither having stated satisfactory reasons why they should not be held in contempt of court, the court assessed a fine against each of the parties in the sum of $100, and ordered both committed to the county jail until such fine should be paid, or they purged themselves of contempt.

From such record as the court reporter made at the time of the disturbance in the court room, it appears that when John W. Young and Heber Finch, Sr., were brought before the court that the only explanation or reason offered as to why they should not be held in contempt was that the fight started outside the court

room and Young contended that Finch struck the first blow, so that he had a right to defend himself, and that such action on his part could not be treated as contempt. On the other hand, Finch claimed that Young followed him from the court room, called him a vile name and struck the first blow.

As the order states, such contentions were not satisfactory to the court, were not considered as constituting a defense for either party, and the fines were assessed. The Court, with reference to Glenn O. Young's offered defense on behalf of John W. Young, that the altercation started outside the court room, said: "I know it, and I can't help where it started, it came into the Court Room and this Court was still in session at the time, and I don't particularly care for that. I sat here and tried to keep you two from jawing at each other while you were having this hearing." The court further said: "As far as I'm concerned, they were both fighting in the Court Room. Now I am willing to listen to any reasonable contention about it on either side. Where they are both fighting in the Court Room I think they both ought to be fined. They can avoid fighting in the Court Room."

The record reflects, however, that Mr. Glenn O. Young on the 22nd of December, 1952, acting as counsel for John W. Young, insisted that a further hearing be had and that the defendant be given opportunity to "explain what happened", and to present evidence. The court upon such insistence agreed to set the matter down for further hearing. Said the Court: "I am suspending the Order requiring both of you to pay it; that is, suspending the Order that they be committed to jail, until the 8 day of January, at which time I will have a hearing for the purpose of determining whether or not either party is entitled to have this Order presently entered, set aside. Now is that clear enough?"

Although the court had suspended the order fining the parties, as above indicated, nevertheless, on December 23, 1952, the defendant Young filed a "Motion to Vacate Order and Judgment Holding John W. Young in Contempt of Court."

On January 8, 1953 when the matter came on for further hearing, the following occurred:

"By Mr. Glenn O. Young: 'Let the record show that this is the matter of Contempt charges against John W. Young. It is a Motion to Vacate an Order of Judgment holding John W. Young in Contempt. John W. Young appears in person and by Glenn O. Young and David Young, and Glenn A. Young.

"If the Court please, in regard to this Motion filed on behalf of John W. Young, our position is that the defendant, John W. Young, wasn't accorded an opportunity to be heard in the court. We say the Court has authority to punish for direct contempt of Court, a contempt committed in the presence of the Court. This matter that is here occurred contrary to that circumstance. I think about all Your Honor could have known is that there was a commotion in the back of the Court Room, and the circumstances under which it originated wasn't apparent either to Your Honor or anyone else. I think the court should have accorded the parties, each of them, an opportunity—we are not speaking for Mr. Finch—to show cause why they should not be held in contempt, rather than merely charging them to be in contempt.

"That seems to be the procedure as I understand it. As I understand it, Your Honor assessed a sentence against them and allowed them until today to show cause why they shouldn't pay the punishment. As I understand the procedure to be would be to allow them to show cause before the punishment is assessed. I think the procedure should be to allow them to plead guilty or not guilty and give them an opportunity—

"By the Court: Mr. Young, in that connection, this is what happened as I recall: After the episode took place, the bailiff brought both parties around here, and at that time I asked each one if they had any reason to state why they shouldn't be held in Contempt of Court, and the answer to that question was by both of them that the other started the fight. As I recall, I made the statement into the record that I wasn't particularly concerned with who started the fight; that as far as I was concerned, they were both fighting in the Court Room and I assessed a penalty on that. Now my understanding of the law of contempt is that on a direct contempt that happens in the presence of the Court, all the Court is required to do is ask the parties why they should not be held in contempt of court. And if they state a reason that is sufficient, the court isn't holding them in Contempt of Court. In my opinion that is all the hearing they are entitled to.

"Now, then, after the sentence was assessed against them, or the punishment assessed against them, there was some conversation about who started it, and strictly on the basis of two things; one was that both of the parties might not have intended to disturb the Court, by fighting, because it did start out of the presence of the Court, and on the possibilty that one or the other wasn't responsible for it. In order to determine the answers to those two questions, I allowed this hearing today, which I think is really unnecessary."

Following this, the court heard a number of witnesses called by the defendant Young to show that Heber Finch, Sr., had falsely accused him in a hearing before the court on December 22, 1952, of withholding certain files in a case that had been tried before the court and wherein Heber Finch, Sr., was seeking a new trial based on such contention, which defendant asserted was false. Defendant called as a witness Heber Finch, Sr., to show facts concerning records defendant had been accused of withholding and to show what happened in the hall right outside the court room at the close of the case.

By Mr. Glenn O. Young:

"Q. After you left the Court Room, I mean after the motion was heard here

by His Honor, what did you do immediately after that? A. Walked out of the Court Room.

"Q. Were you accosted or interfered with in any manner as you left the Court Room? A. I was stopped after I got outside of the Court Room.

"Q. Did you understand the Court was still in session after that matter was concluded? A. I didn't understand anything; I didn't know anything about it. I had finished and I saw some other lawyers around here and I didn't know. That was all I had, and when I got through, I got my hat and got outside.

"Q. When you were outside of the Court Room, will you state what occurred? A. John Young said 'Hey!'

"Q. You say you were outside of the Court Room when John Young said 'Hey'? A. Yes, sir.

"Q. What happened then? A. He said, 'You old son of a bitch, I am going to beat hell out of you', and I told him to get started, .

"Q. Then what happened? A. Well, he hit at me and hit the top part of my shoulder, and then we went at it hand and. paw.

"Q. And then what happened? A. In the scuffle he got me by the tie and hung his hand somewhere in my coat. and pulled, and we fell through the door back there."

It was further sought to show that Heber Finch, Sr., had admitted that he hit John W. Young and knocked him into the court room, but witness would not admit that, claiming that a newspaper reporter to whom he had talked by telephone did not get the story just as he had related it.

Defendant further sought to show that Heber Finch, Jr., had interfered in the fight and had struck him, and that Finch, Jr., also should be fined. The bailiff, C. G. Scott, testified that when the fight started attorney Jennings was addressing the Court; that the case had just begun; that at the time the commotion started in the hall he heard licks struck, then he saw John Young backing in the door about half bend-

ing over; that Finch, Jr., started back there and he started back also, and that the combatants were about down on the floor; that Finch, Jr., grabbed John by the coat and drew back his hand as if to hit him, and that he, the bailiff, told Finch, Jr., not to do that and grabbed Finch, Jr. around the neck; that John and Finch, Sr. were then on the floor; that the court had done quite a bit of rapping at that time.

The court stated that he did not observe Finch, Jr., actually strike Young, and Finch, Jr., testified and contended that he merely attempted to separate the combatants but was stopped by the bailiff. The court said: "You have both overlooked the fact that I sat here and watched the whole proceeding after it got through the door, and I am pretty familiar with what occurred."

John W. Young testified, and was questioned by his counsel, Glenn O. Young, in part as follows:

"Q. As an excuse for attempting to reopen this case, as I understand, Mr. Finch stated in Court, in substance, that you had these files and therefore he could not offer this evidence in the usual course? A. That's right. He accused me of being unethical by not letting him see those files, when at no time he made no demand; didn't issue any subpoena, nor made any oral request to the Court at the time concerning these files.

"Q. You were present when these statements were made here to His Honor, you say? A. Yes, sir.

"Q. Did you remonstrate in the course of that hearing? A. Yes, sir. After Mr. Finch got through, I attempted to clarify the record on it and the Court, for some reason, interrupted me.

"Q. What happened following the period here in the Court Room? A. After it was over with, I waited and followed Mr. Finch outside the court room; I saw him and I told him, I said, 'Listen, you old son of a bitch, if you don't quit lying about me, I am going to beat hell out of you'; and then he hauled off and struck at me, and when

he struck at me, I ducked and pulled him back—started jerking him down by his arm, and then Heber Finch, Jr. came up behind me and came around and hit me in the face like that, (witness indicating), and after that, Mr. Finch fell on the floor and I heard the Judge rapping for order. And then Heber, Jr., made a lunge for me and I ducked back behind one of those chairs back there where those people are sitting. At no time did I have any contempt for the Court. I did have contempt for the tactics of Mr. Finch for having a lawsuit up here on trial for sixteen months and then in an attempt to reopen a lawsuit, in order to get some more evidence that he didn't show the materiality of, to come up and accuse me of being dishonest. Mr. Finch hit me first, and so I didn't want to hurt the old man, so I just pulled him down."

The defendant asked that the case be further continued by reason of the absence of a witness, Pete Delaney, whom he stated had been subpoenaed. The court on such request continued the hearing until three P.M. of that day, but the witness still not having appeared, the court continued the case until ten o'clock, January 10, 1953, at which time Delaney testified that he was a cable tool driller and was in the court room on December 22, 1952 and that he saw Heber Finch, Jr., take a swing at John W. Young but could not tell whether he hit him or not and that someone separated the defendant Young and Finch, Sr.

At the conclusion of the hearing, on January 10, 1953, the court ruled:

"By the Court: Alright, it will be the order of the Court at this time that both of these parties, Mr. Heber Finch, Sr., and Mr. John W. Young, were fighting in the Court Room. The record will show that they were engaged in, I guess you would call it 'physical combat', in the presence of the Court, while the Court was still in session—the Judge was still on the Bench. After that, they were brought before the Court and asked to state whether they had any reason why they shouldn't be held in contempt. The

Court at the time, that the reasons stated, as they were, were not sufficient to relieve them of the contempt charge; the Court is still of that opinion.

"It will be the order of the Court that each one pay a fine of One Hundred ($100.00) Dollars and committed to the County Jail until such fine is paid."

The above ruling is reflected in the written order thereafter filed in the case, and hereinbefore quoted.

From the formal and final order of the court filed on the 12th day of January, 1953, after the completion of the hearing had on January 10, 1953, and from the record as a whole, we conclude that the defendant was given an opportunity on December 22, 1952 to give the court reasons why he should not be held in contempt of court and that the reasons given did not constitute a defense; that the court out of an abundance of caution and to give the contemners further opportunity to be heard, and at the instance of the defendant Young, continued the case for further hearing until January 8, 1953, the effect being to suspend the execution of the judgment, or order of December 22, 1952, until he would hear the proposed evidence, and that the evidence submitted on January 8, 1953 by the defendant Young, as a matter of law, failed to develop anything to relieve him of the consequences of his fighting in the presence of the court at time the court was in session.

As stated above by Doyle, J., in Moss v. Arnold, supra, 63 Okl.Cr. at page 378, 75 P.2d at page 506, "whether a direct contempt has been committed does not depend on the intention of the offending party, but on the act done."

This principle is also illustrated in the direct contempt case of Lynn v. State, 38 Okl.Cr. 313, 260 P. 1069, where the defendant was adjudged guilty of a direct criminal contempt and was sentenced to serve ninety days in jail. The defendant, an officer of the law, was being tried before the court and jury on a charge of murder. During the trial of the case defendant came into court with a loaded pistol on his person and

accidentally dropped it on the floor in the presence of the court and jury, although the court at the time did not immediately learn that the object that was dropped was actually a weapon. Defendant's attorney stated to the court that he had directed the defendant to bring the pistol into court to demonstrate in evidence. Such fact, if true, as viewed by the court, did not relieve the defendant from being held in contempt. The case was by this court affirmed.

As to the defendant's argument that Heber Finch, Sr. struck the first blow after he was accosted by the defendant in the hall just outside of the court room: The defendant failed to establish this, because he offered Heber Finch, Sr. as a witness and Finch, Sr., denied that he struck the first blow, and although the defendant so testified, the principle was established in the cases of Clark v. State, 65 Okl.Cr. 56, 82 P.2d 844; Jackson v. State, 12 Okl.Cr. 446, 158 P.2d 292; and Brady v. State, 91 Okl.Cr. 367, 219 P.2d 267, that where the evidence for a conviction comes from two witnesses of equal credibility, one testifying to the guilt and the other to the innocence, such testimony would not be sufficient to make out a case. So here the evidence was not sufficient, by such principle, to show that Finch, Sr., struck the first blow. An interrupted answer by Finch cannot fairly be construed to so show, particularly in view of his competent answer later on in his testimony. But as we view the matter, the admission of the defendant when he testified, makes it immaterial who struck the first blow. It is true, as argued by the defendant in his brief, that violent and opprobrious epithets and verbal insults, however aggravating and contemptible, do not constitute justification for an assault. Brewer v. State, 84 Okl.Cr. 235, 180 P.2d 848. However that may be, when the defendant in a fit of anger, as he demonstrated was the case, ran after Finch, Sr., as he left the court room, and said to him just outside the court room: "Listen, you old son of a bitch, if you don't quit lying about me, I am going to beat hell out of you", the defendant could reasonably expect that Mr. Finch would become disturbed, would resent such remarks, and particularly from a young man shown to have been 28 years of age. In fact defendant, based on the history of such conduct, could expect violent reaction on the part of Mr. Finch, regardless of whether the law would excuse him if he actually assaulted his tormentor. The books are full of cases where the reaction to such epithets proved tragic indeed, even though such reaction by the recipient could not be upheld by law.

The defendant then by his own admission set in motion the chain of events that ended up in the melee in the court room. The fact that the combatants might have rolled down the hall and away from the court room and outside the court house is no excuse; nor that the defendant thought that the court was through for the day when the hearing on the motion in which he and Finch, Sr. were involved had been completed, because the court in fact had not adjourned, but had immediately commenced hearing another case.

The court had admonished the parties during the hearing as to their bickering and conduct, and moments later observed them backing into the court room fighting, and while the court was in session. All the excuses offered when the parties were brought before the bench, amounted to each accusing the other of hitting the first blow, and that no contempt was meant. The court correctly rejected such reasons and assessed a penalty of $100 fine, with incarceration in jail if they failed to pay the fines. As stated by this court in Deskins v. State, supra [62 Okl.Cr. 314, 71 P.2d 507]:

"No one doubts either the right or duty of a court to punish as contempts disorderly and contumelious behavior, breaches of the peace, or any willful disturbance in its presence. The right rests on the necessity that was found to exist to enable courts to administer the law without interruption by improper interference, and to maintain their own dignity. So indespensible is this power that its just exercise, so far as it may be necessary for the due protection of the courts, has never been questioned."

Ordinarily, as we have seen from the cases heretofore cited, the only

record that would be made in a direct contempt case, taking place in view of the court, would be the judgment, which would recite the substance of the offense charged and the recital of the facts making it a direct contempt, and showing that the defendant was given opportunity to give reasons why he should not be held in contempt, reciting such reasons, if any given. Ex parte Dawes, supra; Tit. 21 O.S.1951 § 568. Here on appeal the facts would not be reviewed. Only questions of law would be considered. Burke v. Territory, 2 Okl. 499, 37 P. 829; Seifried v. State, 184 Okl. 299, 86 P.2d 1008. As said at page 444 of 12 Am.Jur., Section 78: "A statement filed by a judge as to matters occurring before him is usually regarded as importing absolute verity."

Nevertheless, in the within case, as stated, the court in the exercise of its discretion, did at the instance of the defendant hear further evidence produced by the defendant on two occasions after defendant was originally arraigned for contempt, and the court made further statements into the record, and for such reason we have set the same out at some length, but nothing appears that would show that the court did not have jurisdiction to enter the final order appealed from.

 While we do not approve the order filed in the case on the 12th day of January, 1953 as a model, we do find that it substantially complies with Tit. 21 O.S.1951 § 568. The judgment and commitment set out in Deskins v. State, supra, is more technically correct. We find the judgment entered to be a several judgment, the punishment for each contemner to be the same, and that each contemner could satisfy the judgment against himself without depending on any act of the other. That is to say, the penalty was a fine of $100, and the clause "and ordered that both parties committed to the county jail until such fine was paid or that they purge themself of contempt" simply meant that if the fine was not paid that in lieu thereof the party failing to pay his fine should be confined to jail until he should do so, unless the judgment should be set aside by reason of some further hearing that would cause the court to conclude that contemner was not in contempt. The judgment is definite and certain. The confinement being until the contemner should pay the fine of $100. If he should fail to pay the fine, then by provision of Tit. 28 O.S.1951, § 101, the payment would be enforced by imprisonment until the same should be satisfied, at the rate of one dollar per day, not only to cover the fine assessed, but the costs assessed. The statutory provision has been held constitutional in Ex parte McCoy, 45 Okl.Cr. 52, 281 P. 813. In the case of Ex parte Clemmons, 27 Okl.Cr. 50, 225 P. 184, and Ex parte Lyles, 52 Okl.Cr. 167, 3 P.2d 912. The question raised was gone into in some detail in the Clemmons case. In the body of the opinion we said [27 Okl.Cr. 50, 225 P. 185]:

"The Legislature in 1913 (section 6332, Comp.Stats.1921), probably following the suggestions made by the court in the Roller and Bowes cases [Ex parte Roller, 3 Okl.Cr. 384, 106 P. 548; Ex parte Bowes, 8 Okl.Cr. 201, 127 P. 20], provided that the fine and costs 'shall' be enforced by imprisonment. This statute in part reads as follows:

" 'All costs in the prosecution of all criminal actions shall in case of conviction of the defendant be adjudged a part of the penalty * * * and costs in addition to the * * * fine assessed, shall be enforced by imprisonment.'

"This section specifically repeals prior statutes making a fine and costs a civil liability; the statutes so repealed are sections 885, 6917, 6918, 6921, 6922, 7068, 7793, Snyder's Comp.Laws 1909, also sections 2607, 5290, Stats.1893; and it amends section 31a, c. 69, Sess. Laws 1910.

"A fair construction of this statute impels us to hold that since its enactment its provisions relating to fines and costs automatically become a part of every criminal judgment imposing a fine or imprisonment, or both, and that a failure to make a recital in the judgment that the defendant be held until the fine and costs are satisfied in the manner provided by law will not on habeas corpus relieve the person so convicted from satisfying the fine and costs

in the manner designated by this statute. Jackson v. Boyd, 53 Iowa 536, 5 N.W. 734; Foster v. Territory, 1 Wash. 411, 25 P. 459; Murphy v. State, 38 Ark. 514; In re Luezler v. Perry, Sheriff, 18 Ohio, Cir.Ct.R. 826; In re Carrie McAdams, 21 Ohio Cr.Ct.R. 450; Farris v. Dozier (Ky.) 82 S.W. 615."

If no appeal had been perfected in this case and contemners had failed to pay their fines, then the court would have prepared and signed commitment papers and the clerk of the court would have endorsed the costs thereon. But, an appeal being perfected to this court, the clerk of the trial court would prepare committal papers in accordance with this court's interpretation of the judgment appealed from, so that no uncertainty would exist.

■ It is urged that the final order in this case was entered at a new term of court after the proceedings on December 22, 1952, and that a judgment of conviction rendered by the court out of term time and after the term has lapsed is void. Defendant cites Collins v. State, 5 Okl.Cr. 254, 114 P. 1127, and Ex parte Myers, 12 Okl.Cr. 575, 160 P. 939. A reading of those cases will demonstrate that they are not applicable. Here the order of December 22, 1952 was suspended at the instance of the defendant, and the subsequent hearing at a following term of court was by reason of his insistence. Defendant has no valid ground for complaint that the final order was not put in writing and filed until the January, 1953 term of court, because the motion of defendant to set aside the order of December 22, 1952 was not finally heard until January 10, 1953. See Boykin v. State, 86 Okl.Cr. 175, 190 P. 2d 471.

■ The objection is advanced that the judgment of conviction should be reversed on the ground that the prosecution was not carried on in the name of the State of Oklahoma, citing Art. 7, § 19 of the Oklahoma Constitution, which in part reads:

"* * * All prosecutions shall be carried on in the name and by the authority of the State of Oklahoma. All indictments, informations, and complaints shall conclude, 'against the peace and dignity of the State.'"

See also Art. 2, § 17 of the Oklahoma Bill of Rights, which provides:

"No person shall be prosecuted criminally in courts of record for felony or misdemeanor otherwise than by presentment or indictment or by information. No person shall be prosecuted for a felony by information without having had a preliminary examination before an examining magistrate, or having waived such preliminary examination. Prosecutions may be instituted in courts not of record upon a duly verified complaint."

We would point out that Art. 2, § 25 of the Oklahoma Constitution gave the Legislature the power to "pass laws defining contempts and regulating the proceedings and punishment in matters of contempt". By such authority the Legislature did pass a law defining direct and indirect contempts and specifically gave our courts authority to summarily punish for direct contempts. 21 O.S.1951 § 565. Clearly, then, the prosecutions referred to in Art. 7, § 19, apply only to criminal prosecutions required by the Oklahoma Constitution to be instituted by indictment, information, or duly verified complaint.

The cases of Ex parte Sullivan, Ex parte Dawes, Deskins v. State, Moss v. Arnold, and Lynn v. State, supra, approve the procedure followed in this case. See Van Dyke v. Superior Court, 24 Ariz. 508, 211 P. 576, where the Superior Court of Arizona had occasion to pass upon a similar question, and reached a similar conclusion as we have arrived at here.

The defendant urges that State ex rel. Attorney General v. Owens, 125 Okl. 66, 256 P. 704, 52 A.L.R. 1270 supports his theory that he should have been prosecuted in the name of the State of Oklahoma, and by the county attorney of Creek County.

While the contempt committed by the contemner in that case was held to be a direct contempt, it was by reason of the publishing of an advertisement in a daily paper reflecting upon the honor and integrity of the Court and the filing of certain pleadings therein that likewise reflected upon the honor and integrity of the court. A series of

events were involved and the accused was not actually in the view and presence of the court sitting as a body, so that the attorney general was directed to file an information in the Supreme Court, charging the several acts deemed to constitute contempt of court. And while the procedure there followed was different from that followed in the cases we have cited, the Owens case cannot be considered as authority upholding the contentions of the defendant. And even if it did, such authority would not be binding on this court, though in a case where this court has not committed itself to a rule, an opinion from the Supreme Court would ordinarily be followed. See State v. Manard, 85 Okl. Cr. 105, 185 P.2d 483; Fitzgerald v. State, 85 Okl.Cr. 409, 188 P.2d 412.

It follows from the record considered and what has been said, that the various objections interposed to the final order appealed from are without merit.

For the reasons stated, the judgment of the district court of Creek County, finding John W. Young guilty of direct contempt of Court and providing a fine of $100 is affirmed, and the further provision for commitment to the county jail until the fine and costs are paid is affirmed.

JONES and BRETT, JJ., concur.

## Supplemental Opinion on Rehearing

POWELL, Presiding Judge.

Counsel for the contemnor filed herein an application for rehearing. The petition was supported by an exhaustive brief, and oral argument was granted.

■■■ It is contended that the opinion incorrectly states the record, it being argued, in the words of counsel, that: "There was nothing pending at the close of the court term for further consideration by the court than the *issuance* raised by the motion of John W. Young. While the court stated that he was continuing the hearing, the continuance was expressly 'for the purpose of determining whether or not either party is entitled to have this order presently entered, set aside.'"

We attempted in our opinion to emphasize that on December 22, 1952 when the court viewed the defendant and Mr. Heber Finch, Sr., fighting in the court room, he immediately had them conducted before the bench, and the stenographic record discloses that the court, among other remarks, said: "I want the record to show that Mr. Heber Finch, Sr., and Mr. John W. Young are here before the court, and were engaged in fighting and had to be stopped by the Bailiff and other attorneys. Unless either one of you can show me some reason to the contrary, it will be the judgment of the court that each one of you will be fined One Hundred Dollars for being in contempt of court."

As the written order finally entered and quoted in our opinion states, the reasons offered by the contemnors were unsatisfactory. That could have ended the matter. The court was not required to continue the case for further hearing when he acted on view and gave the contemnors opportunity to be heard. If a contemnor had anything to say, either in defense or mitigation, it was his duty to speak up. This principle is too basic and too well-settled to require further treatment.[1]

And while the court did assess the fine when the participants failed to give satisfactory reasons, the effect of the action of the court in acquiescing in contemnor Young's request for continuance for hearing further evidence, in the opinion of this

1. See the basic case of Ex parte Sullivan, 10 Okl.Cr. 465, 139 P. 815, Ann.Cas. 1916A, 719, and other cases cited on this point in the opinion.

The very cases cited by defendant point out the fundamental requirement that courts have the power to summarily punish for direct contempt. Ex parte Terry, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405; State v. Woodfin, 27 N.C. 199, 42 Am. Dec. 161. But, as we have seen, in Oklahoma it is necessary, in order for the court to acquire jurisdiction to punish for contempt, that the contemnor be arraigned and asked whether he has any legal cause to show why he should not be adjudged guilty of contempt of court. This was not necessary under the common law, and is not necessary in all the states today. See §§ 61, 69, 70, 12 Am. Jur., Contempt; 57 A.L.R. 545, note; 17 C.J.S., Contempt, § 62, pp. 73–74.

court, was to suspend the order and judgment announced. Further, this conclusion is supported by a consideration of the proceedings as a whole, in spite of the interpretation now advanced by counsel for the defendant. No effort was made to appeal from the verbal order of December 22, 1952; Mr. Glenn O. Young, father and one of defendant's counsel, had said: "On behalf of John, I would like to have it set for hearing." The court said: "Alright". And the case was set for further hearing for January 8, 1953. The filing by counsel for contemnor on December 23, 1952 of a "Motion to Vacate Order and Judgment Holding John W. Young in Contempt of Court", could not adjudge the nature and effect of the order of December 22, or control the nature and purpose of the hearing set for January 8, 1953. We again conclude that the contemnor was not placed in double jeopardy, and that the court had jurisdiction to render the final judgment of January 10, 1953, filed January 12, and from which the within appeal has been perfected.

Counsel earnestly contends that it was vital for the court to have known who struck the first blow when the fight between John W. Young and Heber Finch, Sr., commenced in the hall just outside the door to the court room. It is claimed that the facts in relation to this are not correctly stated in the opinion; that when the contemnors were brought before the court that Heber Finch, Sr., did not contend that John W. Young struck him first, but on the contrary that the record conclusively shows that Finch assaulted Young and that therefore Young had a right to defend himself.

While it is immaterial by reasons of the admissions of Young as set out in the opinion, who struck the first blow, we cannot agree that the record justifies the conclusion claimed by counsel. The record shows that Mr. Heber Finch, Sr., stated to the court: "I was on my way out when he followed me out and jumped on me. He came out there and called me a ————." At this point Mr. Glenn O. Young broke in and interrupted the statement. The court then made a statement, and Mr. Glenn O. Young made a further statement, and then Mr. Finch attempted to complete the statement that he had commenced, by saying: "He followed me out there ————", but he was again interrupted by Glenn O. Young, who said, "And you hit him", and Mr. Finch said: "Yes, and I am about two times as old as he is. He called me a ————". The court then broke in. Mr. Finch then said: "If the court please, I want to apologize to the court. I respect the court, and I was on my way home and he followed me out there and jumped me. I want to apologize. I have never showed disrespect to the court in my life."

No further statement was made by Mr. Finch, Sr. We take it that the original statement by Finch, Sr., that, "He followed me out there and jumped on me", and the other statements in no way constitute an admission that he struck the first blow. If Finch, Sr., did not strike the first blow, under the later admission of John W. Young that he followed Finch, Sr. and called him the vile name already stated in the opinion, then Finch, Sr. should not have been fined for contempt, but that question is not before us, as he did not appeal his case.

It is apparent that as the contemnors stood before the bar and after some conversation, the court came to the conclusion that he did not and could not see the commencement of the fight and that one of the parties might not be in contempt, and for such reason he decided to hear further testimony. This is evidenced by the court's statement made on convening of court on January 8, when he said that he permitted the further hearing "on the possibility that one or the other [contemnor] wasn't responsible for it". The court thereby recognized and this court recognizes the principle agreed to by appellant in his brief that conceivably fighting in a court room under all circumstances, would not constitute contempt.

For example, if a person was sitting in the court room and conducting himself as a spectator is required, and someone should assault him, he would certainly have a right to defend himself. Therefore, in the absence of provocation on the part of defendant Young, if Finch, Sr. had assaulted him in or just outside the door to the court room, clearly John W. Young would have been en-

titled to defend himself and he would not have been guilty of contempt for so doing. Even where he vilified Finch, Sr., if Finch, Sr. thereupon assaulted him, he would still be entitled to defend himself, but by reason of the provocation could not in a contempt proceeding escape a penalty assessed by the court, where the disturbance was directly caused by such provocation.

It has been held that an attorney who was addressing a jury, and where his argument was germane to the facts of the case, had a right to draw conclusions from such facts. The conclusion involved was that where two witnesses had testified and contradicted each the other, that either one or the other was mistaken, or one or the other had lied. So that witness Beakley, who was in the court room as a spectator, hearing the statement, arose and interrupted the court proceedings and admonished the attorney not to say that he had lied, and the attorney repeated his statement and was assaulted by the witness and had to defend himself. The trial court held both in contempt of court, but the Texas Court of Criminal Appeals reversed the trial court as to the attorney. In its opinion it was stated [43 Tex.Cr.R. 359, 65 S.W. 1063]:

> "Unless the evidence before us should show that relator [the attorney] was attempting to provoke Beakley [the witness] to a breach of the peace in the court room at the time of the argument, we could not consider said circumstance as going to illustrate or prove the intent of the relator."

One judge dissented, and on the principal ground that he thought there was sufficient provocation. See Ex parte Snodgrass, 43 Tex.Cr.R. 359, 65 S.W. 1061. Supporting the opinion of the court is the holding in Ex parte Heidingsfelder, 84 Tex.Cr.R. 204, 206 S.W. 351. See also U. S. v. Patterson, C.C., 26 F. 509. The Texas cases were cited by the defendant. And while we subscribe to the holding in the cases cited, the factual situation in those cases and the within case are so different and the distinction so obvious as to not require further exposition.

In the within case we have seen that at the hearing on June 8, 1953 the defendant admitted that he hurried after Heber Finch, Sr. and overtook him in the hall just outside the court room and called him the vile name heretofore stated in our original opinion, and said to him: "If you don't stop lying about me I am going to beat hell out of you." Thus John W. Young, by his words and conduct provoked the fight. Under such circumstances it was immaterial who struck the first blow, so far as determining whether the person provoking the difficulty would be in contempt or not. Young admitted that he grabbed Finch and "started jerking him down by the arm" and they same through the door into the court room where Young claimed that Heber Finch, Jr., interfered.

But counsel argues that "The thing that set up the chain of events which ended up in the melee was the false and unwarranted accusations made by Finch in the presence of the court." No doubt the matters happening in the case that the court had been hearing, irrespective of whether Finch was right or whether Young was right, furnished the spark that had inflamed and incensed John W. Young. But that hearing had terminated. It was minutes remote. Finch, Sr., was minding his own business, had gotten his papers and had peaceably departed for his office. He was not molesting John W. Young. But Young, regardless of the great difference in their ages, felt compelled to head off Mr. Finch and seek redress and some measure of satisfaction by at least abusing the older man by vile name-calling and threats. He may have felt highly justified in so doing, for it is stated in his brief, "While the language adopted is not particularly complimentary, the person toward whom such remarks are directed can avoid being thus classified merely by meriting a different classification." Thus is advocated a doctrine permitting a purveyor of insults to arrogate to himself by the very fact of utterance, justification per se.

It is further argued: "While the terms adopted to category Finch, Sr., may in other days have been considered provoca-

tive and inappropriate, such certainly is not the case today." It is further stated that "identical words have been popularized and brought in good repute when used under appropriate circumstances". It is then recounted that two certain high officials in the Federal government [but not in the presence of the vilified] used the words and it is suggested that high state officials have done likewise.

It is probably only too true that high public officials have so forgotton the dignity of their office as to utter public statements containing vile epithets, but the chances are that they were immediately repentant, for public policy requires the striving for the ideal, and when one speaks in the capacity of a representative of the government or one of its agencies, his fitness for such representation requires official conduct on a higher plane and of a higher moral order than might be expected of the individual acting in a private capacity. We are constrained to say, "Ill fares the land, to hastening ills a prey" (Goldsmith), where officials and courts fail to strive for higher standards of conduct.

This court still considers the words in question highly provocative, a goad, as insult, an indignity, that, spoken in anger can be calculated to cause violent reaction from the average recipient, and regardless of the fact that in a prosecution for an assault engendered by the remarks, and that an assailant could not find justification in law, the words might be considered in mitigation of punishment to be assessed, where conviction had, and in the within case the recipient of the epithets at the time they were hurled at him, being peaceably going on his way and attending to his own affairs, the prior bickering between the parties, however in the right defendant might have been, cannot relieve him from the consequences of his conduct recited.

Let the mandate issue forthwith.

JONES and BRETT, JJ., concur.